OLIVE PERKINS, *Alias* OLIVE KARSHNER, v. GER-
SON B. SILVERMAN, Administrator of Estate of
PEARL D. KARSHNER, Appellant.

Division Two, July 19, 1920.

1. **WIDOW'S RIGHT IN PERSONALTY:** Equitable Proceeding.
Controversies concerning the widow's rights in personalty are
equitable proceedings, triable in the circuit court by the judge
alone, and triable *de novo* in the appellate court. A proceeding
involving the question whether the plaintiff was the common-law
wife of decedent and entitled to the articles allowed by the statute
to the widow as her absolute property, or in lieu thereof to a rea-
sonable sum of money, tried in the circuit court, upon appeal from
a disallowance in the probate court, is a suit in the nature of a
suit in equity, triable before the court alone, and triable in the
appellate court *de novo*.

2. **NEW TRIAL:** Newly Discovered Evidence: Cumulative. Newly dis-
covered evidence, presented in the form of affidavits in support of
the motion for a new trial, to the effect that plaintiff was of ill-
repute and bad reputation for chastity both before and after the
making of an alleged contract of marriage between her and de-
cedent, if evidence was offered at the trial that her reputation in
these respects was bad, is merely cumulative, and therefore con-
stitutes no ground for a new trial.

3. **FAILURE TO CALL WITNESS:** Burden. In a proceeding by plain-
tiff to establish her right to share in decedent's personal estate
as his widow, the burden is on her to establish a common-law mar-
riage between them, and it is her duty to call any witness with
whose testimony she is familiar, and no unfavorable inference can
be drawn from the administrator's failure to call the lawyer who
wrote decedent's will and who had previously testified in the pro-
bate court in the same proceeding.

4. **MARRIAGE:** Elements of Contract. To constitute a valid mar-
riage, either under the statute or at common law, there must be,
first, one man and one woman capable of contracting, and, second,
they must enter into a contract, by which they assume the re-
lation of husband and wife for their joint lives, and they must both
understand that neither, nor both, can rescind the contract or de-
stroy the relation.

5. COMMON-LAW MARRIAGE: Prior Illicit Relations: Presumption. Where the evidence establishes that illicit relations had existed between plaintiff and decedent for a long time prior to their entrance into the alleged common-law contract of marriage, such meretricious relation is presumed to continue, and the burden is on her to satisfy the conscience of the court that a new and real relationship of marriage was thereafter, by mutual agreement, in good faith, entered into between them.

6. ———: ———: Insufficient Evidence. The testimony of a girl, at the time thirteen years of age and now seventeen, that she casually overheard a part of a conversation between plaintiff and decedent, who were in an adjoining room, to the effect that decedent told plaintiff (her mother) that he loved her and asked her if she would be his wife, to which her mother replied she loved him and would agree to be his wife, followed by a statement by decedent shortly afterwards at dinner in the presence of the mother that her mother had agreed to be his wife and that he would move his trunk and other personal effects to her apartment the next day, which he did, and they thereafter occupied the same bed, no other person being present, at the time the alleged conversation took place, and that she gave no particular attention to it, did not think it was anybody's business, and had repeated it to no one for three or four years, and then told it only when the suit by her mother to establish her right as widow to share in decedent's estate was contemplated, is not sufficient to establish a common-law contract of marriage between her mother and decedent, who had previously sustained illicit relations with each other and neither of whom had any serious respect for the marriage relation.

7. ———: ———: Repute. A holding out of themselves as husband and wife, by a man and woman who had previously to their alleged common-law contract of marriage sustained illicit sexual relations with each other, at theaters, automobile exhibitions, reputable hotels and among his trades-people, where such repute was necessary for their peace or his success as a dealer in automobiles, and at all other places and among his relatives and employees, and generally, that they were not husband and wife, establishes at best only a mottled repute, and is not sufficient to establish a matrimonial state.

8. ———: Evidence: Subsequent Acts. All the facts and circumstances, and all that was said or done by either the man or woman prior to the death of either, are competent in the suit by the survivor to establish the existence of a marriage relation between them, where reliance is placed upon a common-law contract.

9. ——: ——: **Settlement Document.** A written document, signed and upon oath acknowledged by plaintiff as her free act and deed, in which it was stated that she had been decedent's housekeeper and claimed no right to his property, that they were never married and had never lived together as husband and wife, and that in consideration of $200 paid she released him and his estate of all claims and demands, made a few months prior to his death, followed by an acceptance of the money by her, and preceded and followed by cohabitation, cannot be considered simply as a futile effort by them, made in ignorance of the law, to dissolve a prior alleged contract of marriage, but shows that prior to its execution they had lived together out of wedlock and continued to do so afterwards.

10. ——: ——: **Denial in Decedent's Will.** An admission in a written document signed and under oath acknowleged as her free act by a woman, and a statement in his last will by the man in full consciousness that death was at hand, in which both state that they are single and unmarried, expressed in the clearest terms, is evidence of the most impressive character that their relationships to each other were not those of husband and wife and never had been.

11. ——: **Appellate Jurisdiction: Suit for Widow's Allowance: Determined by Companion Suit.** Claiming to be the widow of a decedent, plaintiff began separate proceedings in the probate court against the administrator (1) to establish her claim to the absolute property given the widow by the statute and to choose in lieu thereof the $400 authorized by the statute and (2) to establish her claim to one-half the personal estate, subject to debts, asserting that decedent left only one child. Both claims were denied in the probate court, and she took separate appeals to the circuit court, and in that court it was agreed by the parties that her claim as widow to the absolute property should be tried first, and the issue in the other claim should abide the judgment in the first. In both proceedings the real issue was whether the relation of husband and wife had existed between plaintiff and decedent by reason of a common-law contract of marriage, and the circuit court found the issue for plaintiff and decreed she "was at the death of decedent, his wife, and is entitled to receive such portion of his estate as is provided by the statutes," and from that judgment the administrator appeals. At the trial it was admitted by both parties that the value of the estate exceeded $20,000 and that decedent left only one child, and the probate records introduced in evidence showed the personal estate to be worth over $30,000, that there were no debts and that the only claim allowed was one for $30 a month for the support of the child. *Held*, on re-hearing, that the amount involved is one-half the personal estate, and the Supreme Court has jurisdiction of the appeal.

Appeal from Jackson Circuit Court.—*Hon. Daniel E. Bird,* Judge.

REVERSED (*with directions.*)

*Lamm, Bohling & Lamm, John E. Burden* and *Gerson B. Silverman* for appellant.

(1) This is a suit to obtain the distribution to respondent of an alleged widow's share in the Karshner estate under Secs. 114, 115 and 116, R. S. 1909, and to establish an alleged status of husband and wife; the defense was that respondent was not the widow of deceased. (a) The better doctrine is that suits having for their purpose the distribution of personal estates, as well as suits pertaining to both the administration and final settlement of estates, are not triable to a jury, but are of an equitable nature, and therefore, on appeal here, this court hears and determines the case, both on the facts and on the law, precisely as if the suit was in equity. Howard v. Strode, 242 Mo. 221; In re Estate of Largue v. Ramsey, 198 Mo. App. 271; Stevens v. Larwill, 110 Mo. App. 149; Whaley v. Whaley, 50 Mo. 582; Ansley v. Richardson, 95 Mo. App. 334-5; In re Estate of Branch, 123 Mo. App. 577; In re Estate of Meeker, 45 Mo. App. 189; Bradley v. Woerner, 46 Mo. App. 371; Finley v. Schlueter, 54 Mo. App. 455. (b) But whether the suit is one of an equitable nature or not is not vital; for in this case there is no substantial evidence of the kind required by the law to establish a common-law marriage. (2) It is established beyond all question on this record that the relations between respondent and deceased commenced while she was the wife of Benjamin F. Perkins and he was the husband of Josie I. Karshner; in other words, that these relations were adulterous at the outset. The status of the inception of their relations being such the trial court erroneously in its findings and judgment ignored the proposition that such illicit relations are

284 Mo.—16.

presumed to continue on the same footing; and ignored the further proposition that the burden was, therefore, cast upon respondent to show by unequivocal evidence that such status was changed in good faith by mutual consent, to that of husband and wife. Cargile v. Wood, 63 Mo. 514; Williams v. Williams, 46 Wis. 477, 480; Drawdy v. Hesters, 60 S. E. 451, 15 L. R. A. (N. S.) 190; Appeal of R. & I. & T. Co. Guardian, 113 Pa. St. 204. (3) The trial court in finding the issues for respondent erroneously ignored the propositions that: (a) Common-law marriages are not favored by the courts. That to establish a common-law marriage in Missouri, the proof should be "stringent." There should be substantial proof and a "high standard of it" to establish such marriage. Williams v. Williams, 259 Mo. 252; Nelson v. Jones, 245 Mo. 573; Bishop v. Brittain Inv. Co., 229 Mo. 724, 726. (b) The trend of the modern judicial mind is to critically analyze and carefully weigh the testimony in cases where common-law marriages are claimed, for instance, when there is no bona-fide marriage (as here) and one is simulated, it is to be expected that some of the concomitants and simulations of a genuine marriage will be copied and appropriated. Cherry v. Cherry, 258 Mo. 391; Grigsby v. Reib, 105 Tex. 600; Williams v. Williams, 259 Mo. 252; Topper v. Perry, 197 Mo. 545. (4) The trial court erred in its declarations of law, given for respondent, and in its findings and judgment erroneously ignored the following settled doctrines: (a) That to constitute a valid common-law marriage there must be, among other elements, a mutual intent to in good faith assume, and continue during life, the relation of husband and wife. (b) That when cohabitation is relied on, as here, it must be cohabitation as husband and wife and not as a screen to that of man and kept mistress. (c) That absent a ceremonial marriage (as here) the reputation, habit and repute, necessary to validly establish a common-law marriage, must be uniform and general or common among acquaintances,

relatives and the public.  Bishop v. Brittain Inv. Co., 229 Mo. 727;  Topper v. Perry, 197 Mo. 545;  Nelson v. Jones, 245 Mo. 597;  Banks v. Galbraith, 149 Mo. 536;  Williams v. Williams, 259 Mo. 252:  State v. Kennedy, 207 Mo. 536;  Pegg v. Pegg, 138 Iowa, 572;  In re Smith's Estate, 133 N. Y. Supp. 730.

*Harry G. Kyle* for respondent.

(1) Cumulative or impeaching evidence does not constitute grounds for new trial.  Folding Bed Co. v. Railway, 148 Mo. 484;  Gardner v. Railway, 167 Mo. App. 605;  Stahlman v. Railway, 183 Mo. App. 144;  Roth Grocery Co. v. Hotel, 183 Mo. App. 429;  Lyons v. Railway, 253 Mo. 143;  Ford v. Storage Co., 138 Mo. App. 512;  Stamping Works v. Wicks, 144 Mo. App. 249;  Parker v. St. Louis, 109 S. W. 1073;  Blake v. Royal Insurance, 112 S. W. 1000;  Devoy v. St. Louis, 192 Mo. 197.  (2) A common-law marriage is valid in Missouri.  The issuance of a license or the celebration of a marriage ceremony is not necessary to constitute a valid marriage. A common-law marriage exists when a man and woman enter into an agreement to be husband and wife, and in pursuance of such agreement, live together and cohabit as husband and wife, and hold each other out to the public as husband and wife.  Butterfield v. Ennis, 193 Mo. App. 638;  Pope v. Mo. Pac. Ry. Co., 175 S. W. 955; State v. Rotter, 193 Mo. App. 110;  Jordan v. Mo. & Kan. Tel. Co., 136 Mo. App. 192;  Bishop v. Britton Inv. Co., 229 Mo. 699;  Imboden v. Trust Co., 111 Mo. App. 220; Topper v. Perry, 197 Mo. 531.  (3) When persons live and cohabit together and are reputed to be married, they are presumed to be married, as it will not be presumed that they have violated the law, and where a presumption of marriage has once so arisen, it can be overthrown only by the most cogent proof.  The presumption of marriage arising under such circumstances is the strongest presumption known to the law. 1 Jones on Evidence,

p. 101; Bishop v. Brittain Inv. Co., 229 Mo. 699; Jackson v. Phalen, 140 S. W. 879; Maier v. Brock, 222 Mo. 74; Plattner v. Plattner, 116 Mo. App. 405. (4) A valid agreement of common-law marriage once entered into, the parties thereto living together and cohabiting as husband and wife and holding each other out to the public as husband and wife, cannot be rescinded or dissolved by them; only a court of competent jurisdiction can dissolve the contract. Bishop v. Brittain Inv. Co., 229 Mo. 699; Jordan v. Tel. Co., 136 Mo. App. 192; Trammell v. Vaughan, 158 Mo. 222; Coy v. Humphreys, 142 Mo. App. 92. (5) A marriage contract may be proved as other contracts. Davis v. Stouffer, 132 Mo. App. 555; Imboden v. Trust Co., 111 Mo. App. 220; Plattner v. Plattner, 116 Mo. App. 405. (6) The evidence was sufficient to show marriage. Butterfield v. Ennis, 193 Mo. App. 638; State v. Rotter, 193 Mo. App. 110; Pope v. Mo. Pac., 175 S. W. 955; State v. Bittick, 103 Mo. 183. (7) Should this court find that the relation of the parties was meretricious in its inception (the record does not so show), yet, nevertheless, if after the impediment was removed, they continued to live and cohabit together and held themselves out as husband and wife the courts will presume a lawful marriage immediately after the removal of the legal impediment. 1 Jones on Evidence, pp. 428-430; State v. Rotter, 193 Mo. App. 110, 181 S. W. 1158; Gross v. Gross, 96 Mo. App. 486, 70 S. W. 393; Bishop v. Brittain Inv. Co., 229 Mo. 699, 129 S. W. 674. (8) The issue involved is a question of law, arising from a legal statutory right upon which trial was had without a jury. It is for this court to determine whether or not there was sufficient evidence to sustain the judgment of the trial court. This is the only point involved in this appeal. Nelson v. Troll, 173 Mo. App. 51, 156 S. W. 16; Ulrici v. Johnston, 177 Mo. App. 591; Fritch v. Fritch, 179 Mo. App. 443; In re Estate of Imboden, 128 Mo. App. 555; Pope v. Mo. Pac. Ry. Co., 175 S. W. 955. (9) The

judgment of the trial court was for the right party; the findings were within the law and the evidence of the case, were responsive to and did dispose of all the issues. No other judgment and findings could have been rendered under the law and the evidence.

SMALL, C.—Appeal from the Circuit Court of Jackson County. This proceeding involves the question of whether the plaintiff was the common-law wife of Pearl D. Karshner at the time of his death. She filed two claims in the Probate Court of Jackson County, Missouri, as widow of said Karshner, one asking for all articles allowed the widow, as her absolute property under Section 114, Revised Statutes 1909, except grain, meat, etc., not on hand, and that in lieu thereof she be allowed a reasonale sum under Section 115, and that she also be allowed to choose as her own property, under Section 116, additional property not to exceed the appraised value of $400. Claim was filed August 31, 1916. On the same date she also filed a claim, as such widow, for interest in the personal property of said estate, alleging that said Karshner left but one child, and that she was the widow and was entitled to one-half of said personal estate, subject to the debts, under Section 349, Revised Statutes 1909, which she prayed the court to order the executor to pay her before an order of distribution be made or final settlement approved.

The administrator with the will annexed filed a paper in said probate court putting in issue each claim filed and especially denying that respondent was ever the wife or widow of said Karshner.

The probate court in due course heard the evidence and denied the plaintiff's claims, holding that she was never the wife of said Karshner, and was not his widow or entitled to any allowance or interest in his estate as such.

On appeal to the circuit court, the parties agreed that the claim for personal property under Sections 114,

115 and 116, would be tried first, and the second claim under Section 349, on the issue of whether plaintiff was the widow of decedent, should abide the judgment on the first claim. The circuit court made an order as to the trial of said claims accordingly. The cause was thereupon taken up and tried by the court, no jury being called for by either party. At the close of the testimony, the plaintiff asked for two declarations of law, which were given, and the defendant asked for a demurrer to the testimony, which was refused. The case was taken under advisement, and subsequently the court filed a written finding of facts, also a review of the law, in pursuance of which the court found the issues for plaintiff, rendered judgment that she was the wife of said Karshner at the time of his death, and as such was entitled to receive such portion of his estate as provided by the statutes of Missouri. After unsuccessfully moving for a new trial, the appellant appealed to this court.

The evidence showed that plaintiff on the 4th day of June, 1913, was divorced by her husband, B. F. Perkins, by a decree of the Circuit Court of Jackson County, on the ground of desertion, and the thirteen-year-old daughter, Beatrice Fay Perkins, given into the custody of the father. That on the 12th day of December, 1912, Josie I. Karshner, the wife of Pearl D. Karshner, obtained a divorce in said circuit court from him, and she was awarded the custody of their twelve-year-old son. Both the Karshners and the Perkinses had resided in Kansas City for some years. There never was any ceremonial or statutory marriage between plaintiff and said Karshner. The claim is, however, that there was a verbal agreement made on or about the 10th of July, 1913, that they would be husband and wife, and that they at all times thereafter cohabited as husband and wife and held themselves out and were reputed to be husband and wife up till the time of Karshner's death. Karshner was in the automobile business for eight or ten years before his death. He died July 15, 1916.

The only direct evidence in support of said verbal agreement was given by said Fay Perkins, the plaintiff's daughter. At the time of the trial she was about eighteen years old. On her direct-examination, she testified: That her father's name was Benjamin Franklin Perkins. That her father and mother and herself moved to Kansas City when she was six years old. That she attended the public schools, and also, St. Theresa and St. Agnes' convents in Kansas City, and the last four years of her school life attended the Sacred Heart Academy at Cedar Rapids, Iowa. While at Cedar Rapids, she would come home to Kansas City to spend the Christmas and summer vacations. That she always lived with her mother. That her father and mother were divorced June 4, 1913, but had not been living together for about three years before. Her father was a traveling man. She and her mother moved to 1425 Central Street July 8, 1913. She met Pearl D. Karshner in 1910. She and her mother were then living at the Washington Hotel. Karshner called upon them at 1425 Central Street the night she and her mother moved there, and he was there on the 9th and 10th. That in the evening of July 10th, while she was in the dining room, and Karshner and her mother were in the kitchen, she overheard part of a conversation between them. "I heard Mr. Karshner tell mother that he had loved her, and had loved her for quite some time, and wanted to know if she would agree to be his wife, and mother said, 'Yes,' she loved him, and would agree to be his wife. And during dinner Mr. Karshner told me that she had agreed to be his wife and that he would move his things down there the next day. Mother said she loved him and that we would all be happy together." On the night of July 11, 1913, Karshner brought his trunk and clothes and occupied the same bed with plaintiff. They continued to occupy the same bed every night that summer, until witness returned to school at Cedar Rapids. When she came back Christmas, 1913, her mother and Karshner were living at the Cor-

dova Hotel. When she came home in June, 1914, her mother and Karshner were living at 305 West 13th Street in a flat known as the Kenilworth. Karshner and her mother occupied the same bed at this place until the time he died, July 15, 1916. Witness came home from the academy in the latter part of May, 1916. Karshner was there until he was taken to the hospital. When she was away at school, she addressed letters and postal cards to her mother as Mrs. P. D. Karshner, 305 West 13th Street. Cards so addressed, dated March and April, 1915, and April, 1916, were introduced in evidence. Her mother's mail was addressed to her at that number as Mrs. P. D. Karshner. People called her mother over the telephone as Mrs. Karshner. The bills for household expenses at this place were mostly ordered by her mother and paid for by Karshner. At one time Karshner's brother was at 305 West 13th Street and Karshner introduced him to her mother, calling her mother, Mrs. Karshner. Karshner's sister was there for dinner with her brother. Her name was Mrs. Black. Both he and Mrs. Black addressed her mother as Mrs. Karshner. The Blacks lived in the south part of Kansas City, and her mother visited them at their home. Karshner would occasionally bring business acquaintances to the house. She and her mother would ride out with Karshner and these men, and also go to the hotels and clubs to dine with them. They addressed her mother as Mrs. Karshner. Others, among them Chief Henderson of the City Fire Department, and his sister-in-law and niece, called her mother Mrs. Karshner. They also visited Chief Henderson's house. Mr. Oglebay, always spoke to her mother when around Karshner's garage and addressed her as Mrs. Karshner.

On cross-examination, witness stated that she and her mother moved to Chicago in December, 1916. They were there some time, but not ever since. Her mother supported her. Her mother had a little money after

Karshner's death. Also she sold her diamonds and worked for Oppenheims' Typewriting Company in Chicago. Witness did not work, but received money from her father in Cedar Rapids. Her mother worked at no place other than Oppenheims for three or four months. They lived at three or four different places in Chicago. Witness visited her father at Cedar Rapids, while her mother was in Chicago; staid there a month. Her father was married again and lived at Cedar Rapids. As to the conversation relating to the marriage contract that she had heard, she said, " I remember Mr. Karshner said to mother that he loved her, had loved her for some time, and wanted to know if she would agree to be his wife. That is as exact as I can come to it. She said she would agree to be his wife. That was as much as I heard. I didn't pay much attention to it." Witness never mentioned that conversation to anyone until she was in Mr. Kyle's office with her mother. It was nobody's business. She never knew any of the other tenants in the flat at 1425 Central Street. Here witness identified the name Olive Perkins endorsed on a check on the Southwest National Bank of Commerce, dated Kansas City, Mo. 5/1/1916, as the handwriting of her mother. It was for $200 and made payable to the order of Miss Olive Perkins. The check was signed by Karshner Motor Car Company, P. D. Karshner. It was marked "paid, May 1, 1916." Witness continued: They lived at the Washington Hotel when she first became acquainted with Karshner. Her father and mother were separated before their divorce for about three or four years. Her mother called on Karshner at his garage, and took meals with him down town in the restaurants, and went around with him to different places in Kansas City, and they were frequently in each other's company, before her father divorced her mother. From the Washington Hotel, she and her mother moved to the Brunswick Hotel. Karshner's garage was then in the next block to the Brunswick. He called for her to take a ride, but did not come to her mother's room, while she

was there. From the Brunswick, she and her mother moved to 923 Penn Street, then moved to the St. John on West 10th Street. While there Karshner used to come over and take her mother out riding with the witness and also alone. That was before her father divorced her mother. From the St. John, she and her mother moved to the Wyandotte Hotel. They lived there a year or two. Karshner called for her mother at the Wyandotte Hotel, just the same as he did at the other places. During all of this time, she and her mother would call on Karshner at his garage. From the Wyandotte Hotel they moved to 1425 Central Street, and from there, with Karshner, to the Cordova Hotel. Then they all moved to 305 West 13th Street. Witness got home in May, 1916; Karshner at that time had his trunk at the Bray Hotel, but he never slept there, but had a room there. She and her mother went there twice and called on Karshner. He asked them to come up. They went with him after some of his clothes. They took the clothes back to 305 West 13th Street. Witness did not know why Karshner went to the Bray Hotel. "It was some kind of a quarrel or something." Karshner was a good friend of Oglebay. Karshner's sister was at their house two or three times. Asked whether witness did not testify before Judge GUINOTTE (Judge of the Probate Court), that when she came home in May, 1916, she was informed that Karshner was living at the Bray Hotel, she replied, "Yes;" she guessed that she said that he lived there until he died, but he was at her mother's apartments quite a bit of the time, and came into her apartments from the rear from his garage, on the afternoon he was taken sick. He came up there to lie down; he was very sick. He staid there a day or two, and then was taken away to the hospital. Witness said she testified before Judge GUINOTTE, that she and her mother went to the Bray Hotel, because Karshner asked them to come down, just to talk, she did not remember what about. About a week after Karshner died, she and her mother went to the automobile show. Her mother was dressed in bright

clothes and wore a yellow sweater. In Judge GUINOTTE's court she was dressed in black. That summer, after Karshner's death, her mother had bought her clothes for the summer, and she could not afford to wear black then, but she bought black for winter. She had some diamonds worth possibly $1,000, Karshner gave her the diamonds; they were all good stones. He also gave her jewelry, and paid for all of her clothing. Before going up to the Bray Hotel, Karshner and her mother and witness had been out to eat together, and they went up and got some of his clothes and took them home. After May 1st (when her mother got the check payable to Miss Olive Perkins) he lived and slept with her mother as before, up until the time of his death. At this point, the witness identified the signature "Olive Perkins" to the following document and affidavit, as the signature of her mother:

"This agreement made and entered into this 1st day of May, 1916, by and between Olive Perkins, party of the first part, and Pearl D. Karshner, party of the second part, both of Kansas City, Jackson County, Missouri.

"Witnesseth, that said Olive Perkins has performed certain services in and about keeping house and caring for the said party of the second part; that neither party claims any other right, title or interest in the property of the other, whether real or personal; that they were never married or lived together as husband and wife; that especially the said party of the first part, does not make any other claim against the said party of the second part, except that of the value of the above services rendered by her to said party of the second part, and now in consideration of the sum of two hundred dollars, the receipt of which is hereby acknowledged by the said party of the first part, Olive Perkins, the said Olive Perkins now by this instrument releases said second party, Pearl D. Karshner, from any and all claims of whatever nature and character and now disclaims any claim and forever releases said second party, his heirs and assigns from any claim in the future, that she may now have or may hereafter have against second party.

"Further both parties now, and especially second party denies that first party has any claim against second party, and that second party denies that he is any way under any obligation to first party, but to better adjust any differences that first party claims second party owes her, the party of the first part, from and after the execution of this

instrument second party owes her nothing and that all claims first has against second party is satisfied in full.

"OLIVE PERKINS.

"State of Missouri,
County of Jackson.

"Before me personally appeared, Olive Perkins the party described in the foregoing instrument, and acknowledged that she executed the foregoing as her free act and deed, that said Olive Perkins being duly sworn upon her oath says that she is not now and never was or claimed to be the wife of the said Pearl D. Karshner.

"OLIVE PERKINS.

"Acknowledged and subscribed and sworn to before me this 1st day of May, 1916.

"GEO. HORN
"Notary Public, Jackson County, Mo.

(Seal)
"My commission expires on the 7th day of March, 1920."

Continuing, the witness said on re-examination by Mr. Kyle: That her mother was never employed by Karshner as housekeeper, and that Geo Horn was Karshner's lawyer.

A number of other witnesses testified for the plaintiff that Karshner took the plaintiff to several automobile shows in Kansas City and Indianapolis, also to the State Fair at Sedalia, and also to Joplin. At all of these shows, as well as at some parties, which they attended at the hotels and clubs in Kansas City, the plaintiff was introduced by Karshner as his wife. He also introduced her as his wife to persons he met at Indianapolis, Sedalia and Joplin, or on the cars going or returning from there, and they registered at the hotels in those places as husband and wife. That they were generally reputed, at least among automobile dealers in Kansas City, to be husband and wife. Also that plaintiff told one of Karshner's employees, and also the manager of one of the apartments where she lived prior to the alleged marriage, that she was married to Karshner; she told them this at the time she lived with Karshner in the Kenilworth Flat. The manager of the Brunswick Hotel, testified, that, while she lived there, she was of good re-

pute. Several witnesses testified that while Karshner
and the plaintiff lived at the Cordova Hotel, which was
from October 8, 1913, until about May, 1914, when they
moved to the Kenilworth Flat their reputation at the
hotel was good, and that they were reputed to be husband
and wife. Also three or four tenants in the Kenilworth
Flat, and their wives, including the negro janitor and
the rental agent, testified, that while they lived there,
they were reputed to be husband and wife. While at the
Kenilworth Flat in 1915, Karshner had an operation
performed at the St. Joseph's Hospital, and he intro-
duced the surgeon to plaintiff as his wife, and also to a
physician who attended his wife two or three times for
some ailment which she had. She was also known and
had a line of credit as Mrs. Karshner while they lived at
the Kenilworth Flat, at different grocery, furniture,
clothing and music stores; the bills were charged to
Karshner, which he generally, if not always paid. Karsh-
ner introduced her to a number of these tradesmen as
his wife or as Mrs. Karshner. He also frequently drove
over the streets and boulevards of Kansas City with
different people to whom he introduced her as his wife.

On the other hand, the appellant's evidence showed,
that while they lived at 1425 Central Street, which was
also a flat, after the date of the alleged marriage, plain-
tiff told one of the other tenants, that she was Mrs.
Perkins and that Karshner boarded and roomed at her
house. During this same time, Karshner told a man who
had formerly worked for him, that he was not married
to the plaintiff, and would not marry her under any
circumstances. Also eight or ten employees, who work-
ed for Karshner at his garage, part or all of five years
preceding his death, testified, that the plaintiff was never
introduced to them as Mrs. Karshner, and was never
known or reputed at the garage to be Karshner's wife,
but was always known as Mrs. Perkins, and most of them
said that at the garage she was known as a woman of
ill-repute. Several of these employees testified that
they saw her at places of bad-repute, alone or with other

men. Two of them testified that they took her, each on one occasion, and left her at a house of prostitution, while she lived with Karshner. (But plaintiff's daughter, Fay, testified in rebuttal, that one of these houses was the home of a respectable woman whom her mother visited). Some of the customers, who knew the plaintiff, complained to one of Karshner's employees, because of the latter permitting her to be around the garage. And one customer of Karshner's branch house in Joplin, who said that he had seen the plaintiff in questionable places in Kansas City with other men, complained to the man in charge there that Karshner should take chances when registering her as his wife at the hotel in Joplin.

On November 19, 1913, Karshner had a room in the Hotel Edward. The clerk of that hotel testified for appellant, that about midnight he was informed that Karshner had a woman in his room. He had registered there alone. The clerk called up Karshner over the house telephone, and told him that he would have to dismiss his company, which he did without protest, simply saying, "All right." Shortly afterwards, the plaintiff stepped out of the elevator and left the hotel alone. The clerk testified that Karshner was in the habit of bringing women there against the rules, and that on one occasion a woman registered in another room, but was found in his room, and both were dismissed from the hotel. That about a week or two after the time when the clerk reprimanded Karshner on the occasion when plaintiff was there, Karshner again applied for a room in which to take up permanent quarters at the hotel, but the clerk told him that he was an undesirable guest on account of his violating the rules against bringing women there without registering them, but Karshner claimed that he had brought his wife. He told Karshner that that was an old excuse. The clerk did not understand whether by his wife he referred to the plaintiff, or to the other woman who was found in Karshner's room on the occasion when both of them were dismissed from the hotel,

Mrs. Llyod, Karshner's book-keeper, who had been in his employ as such many years, testified that in the latter part of 1915, plaintiff told her that her former husband, Perkins, had married again, and that she felt very badly, as she thought that she could always go back and live with him any time she wanted to, and now she felt that she was gone. Also the witness Sutherland, constable, who had lived for 32 years at 1316 Central Street, which was within a few feet of Karshner's garage, testified that Karshner told him that the plaintiff was not related to him, and that her name was Mrs. Perkins.

About the 8th of May, 1916, Karshner engaged a room at the Bray Hotel, which he retained and where he lived, at least part of the time, up until the time he went to the University Hospital on June 8, 1916. On that day he was taken violently ill at his garage, which was only a few doors from the Kenilworth Flat. He went over there to lie down, and a few hours thereafter was taken to the University Hospital, where he remained until he died, July 15, 1916. The plaintiff accompanied him to the hospital and to the room to which he was taken there. On the next day, he was operated upon for appendicitis, and had a second operation performed about three weeks afterwards. Three nurses attended Karshner during his five weeks' stay at this hospital. One of them served him only the first day; she testified that plaintiff was only known as Mrs. Perkins at the hospital. The nurse who succeeded her testified that Karshner told her, during the first ten days that he was there, that plaintiff was not his wife and he did not want her to visit him, and for her to tell Dr. Perkins so. She told Dr. Perkins, and Dr. Perkins, a witness for the plaintiff, says, that he interviewed Karshner on the subject, and Karshner told him that he preferred that plaintiff be not admitted to see him. Dr. Perkins also testified that he had seen plaintiff around the garage, and although no one had told him that she was Karshner's wife, he knew her as Mrs. Karshner, until the nurse told him she was not. The last nurse who attended Karshner during his illness

testified that Karshner told her that plaintiff was not his wife, and that he did not desire her to see him.

Mrs. Brown was the book-keeper at the hospital, and she made out the entrance slip and said that she received her information from Karshner, which she put down on the slip, stating that he was married, his wife was his nearest relative, and his residence was 305 West 13th Street. Mrs. Brown also testified that. plaintiff was known around the hospital all the time as Mrs. Karshner, until after Karshner's death There arose a controversy as to the residence put down on a hospital bill. The bill stated, ''Residence 305 West 13th Street.'' Mr. Horn and Mr. Oglebay called Mrs. Brown's attention to the matter, that his residence should have been the Bray Hotel, and accordingly she wrote in pencil ''Bray Hotel'' as the place of residence on the entrance slip, which, however, Dr. Perkins told her to erase, and let the original entry stand. Oglebay testified that Dr. Perkins told him that they received the information on the entrance slip from Mrs. Perkins, the plaintiff, but Dr. Perkins denied this.

The plaintiff visited Karshner at the hospital nearly every day for the first ten days that he was there. She held his hand, smoothed his brow, and called him ''dear,'' but he was not responsive to her ministrations. On one occasion, he said to her, ''How did you get in here?'' After about the first ten days, plaintiff did not call so often, and about the last week of his life did not visit him at all.

After the first ten days, Karshner's divorced wife, Josie I. Karshner, visited him at the hospital. She came nearly every day until he died. He told the nurses that that he had no objection to her coming. She also told the nurses that the plaintiff was not his wife.

About the 18th of June, his mother, who came from Ohio to his bedside, to visit him, went to the hospital. When she arrived at his room, the plaintiff was there, and Karshner introduced her to his mother as Mrs. Perkins. The mother was present as a witness and testified at

both trials. She said that she had never heard of the plaintiff before, never knew that her son had associated with her in any manner, never heard from him or from Mrs. Black, her daughter, or any of the family, that her son lived with or was married to her. That when plaintiff was introduced by Karshner to her as Mrs. Perkins, the plaintiff nodded her head and said nothing. She never visited her, and plaintiff never invited her to visit her. Her daughter never told her that she had visited plaintiff, but had said that she had visited her brother.

While in the hospital Karshner made his will, in which he gave his mother, naming her, $2,000, his brother-in-law, Black, a note of $750 and interest, and a further obligation of $150 and interest, both of which he wished cancelled. The fourth clause of his will was as follows: "Fourth: To my friend George Horn, of Kansas City, Mo., for his services as my attorney rendered me in the past and for such services as my executor may request of him in the settlement of my estate, I give, will and bequeath the sum of $1,000 to him and his heirs forever." By the fifth clause, all the remainder of his property he gave to his "beloved son, Kenneth M. Karshner," and stated, "I want it known that I am a single man and unmarried; that my said son, Kenneth M. Karshner, is my only child; that I have no other children or their descendants." The last clause of the will appointed Frank M. Olgebay of Kansas City, Missouri, his executor without bond. The will was duly signed and witnessed on the 26th of June, 1916, and subsequently duly probated.

A few days before the will was made, Karshner sent for Oglebay, and showed him a rough draft of a will, which he said he intended to make, and asked Oglebay if he would act as executor, to which Oglebay assented. Oglebay then examined the rough draft of the will, and told Karshner that he ought to write his mother's name in full. Karshner explained the gift

284 Mo.—17

to his brother-in-law, Black, and why he made it. He also told Oglebay that Horn was his lawyer, and he wanted to give him $1,000 for past services, and his services for taking care of the estate. Oglebay told him then that he ought to state definitely in the will the terms of his bequest to Horn. Oglebay says he then asked Karshner whether he was married or single, and he said that he was single. He left the rough draft of the will with Karshner, but he afterwards saw it in the hands of Mr. Horn. Oglebay also testified that he had known Karshner, as well as the plaintiff, for some years. Knew plaintiff by sight when she lived with her husband, Perkins. Had known Karshner since about 1908. That he had never known plaintiff as Mrs. Karshner, but always as Mrs. Perkins. That he had never had any talk with Karshner, prior to the conversation he had with him just before making his will, as to whether he was married or not. That he had bought a number of cars from Karshner, and kept his cars at Karshner's garage. He never called plaintiff Mrs. Karshner.

Plaintiff opened a bank account May 1, 1916, the date of the $200 check payable to Miss Olive Perkins made by Karshner heretofore mentioned, by depositing $200 in the Southwest National Bank of Commerce. She opened said account in the name of Olive Perkins, and afterwards drew numerous small checks, signed, "Miss Olive Perkins," until the deposit was exhausted in July, 1916. The deposit slip was produced, and it was admitted to be in the handwriting of Karshner.

Mr. Horn was present at the hospital when Karshner executed his will, and arranged for the presence of the witnesses. He did not read the will to the witnesses, nor did they see Karshner read it before he signed it. He was very weak at the time, but was able to sign his name. Neither party called Horn as a witness in the circuit court. He seems, however, to have been called as a witness by the appellant in the probate court.

Plaintiff offered to read the transcript of his cross-examination in the probate court, but appellant objected, on the ground that Horn was in Kansas City and plaintiff could subpoena him, if she desired his testimony. This objection was sustained.. Neither Karshner's brother, who lived in the State of Ohio, nor his sister, Mrs. Black, nor her husband, who lived in Oklahoma, were called as a witness by either party. There is an indication, however, from a question asked one of the witnesses by plaintiff's counsel, that Black was present at the trial in the circuit court; and while plaintiff lived with Karshner, the witness testified, Black said she was a woman of ill-repute. The testimony of other witnesses showed that Mrs. Black was present at the trial in the probate court, but did not testify.

Oglebay failed to qualify as executor, Josie I. Karshner was appointed in his stead, and she died during this appeal. The cause was revived in the name of her successor.

Among the grounds urged for a new trial was newly discovered evidence relating to the bad character of the plaintiff for virtue and chastity, both before and after her alleged marriage with Karshner, which grounds were supported by many affidavits. Plaintiff filed one affidavit in opposition, to the effect that her repuation was good while she lived at the Brunswick Hotel.

I. The first question which presents itself, is whether this case is strictly a proceeding at law, so that the finding of facts by the lower court, is binding upon us, as in ordinary law cases tried by the court without a jury, or whether it is in the nature of an equity case, and triable here *de novo*. We think it has been settled by this court that such cases are in the nature of suits in chancery and triable as such in the probate court and the circuit court, and *de novo* as such upon appeal to this court. In Howard v. Strode,

Equitable Proceeding.

242 Mo. 210, this court held that the distribution and the settlement of the decedent's estate were triable by the judge of the probate court, and not by a jury, and that upon appeal, were triable *de novo* by the judge of the circuit court, and not by a jury. The court said, 1. c. 221: "It does not appear that in cases like this the right of trial by jury existed before 1875. It was not given by the common law. There is no statute granting it. We have ruled above that the statutes providing for admeasurement of dower in the circuit court do not apply to the widow's interest in personalty. The uniform unbroken practice in this State has been to try all controversies growing out of final settlements in the probate court, and *concerning the widow's rights in personalty,* by the court without a jury. [Hastings v. Myers' Admr., supra; McFarland v. Baze's Admr., 24 Mo. 156; Hayden v. Hayden's Admr., 23 Mo. 398; Bryant v. McCune, 49 Mo. 546; Cummings v. Cummings, 51 Mo. 263; Dowry v. Bauer, 68 Mo. 155; In re Davis, 62 Mo. 450; Booker v. Armstrong, 93 Mo. 49; Myers v. Myers, 98 Mo. 262; Hitchcock v. Mosher, 106 Mo. 578; Glover v. Holliday, 109 Mo. 108; Clark v. Bettelheim, 144 Mo. 258; In re Estate of Meeker, 45 Mo. App. 186; In re Estate of Danforth, 66 Mo. App. 586.]" (The italics are ours.) See also In re Estate of Schooler v. Stark, 73 Mo. App. 301 and Pearson v. Haydel, 87 Mo. App. 495.

We, therefore, rule that this case was triable and tried as an equity case in the circuit court and is triable *de novo* in this court.

II. As to the newly discovered evidence urged as one of the grounds for a new trial, to-wit, that plaintiff was of ill-repute and her reputation for chastity was bad, both before and after July 10, 1913, the date claimed as the time of making the contract of marriage between plaintiff and Karshner.

Newly
Discovered
Evidence.

Plaintiff contends that this ground is not well taken, because there was evidence at the trial that such was plaintiff's reputation, and that, therefore, the alleg-

ed newly discovered evidence was simply cumulative. The record shows much evidence of that character. Merely cumulative evidence subsequently discovered is no ground for a new trial. [State v. Stewart, 127 Mo. 290, and many cases cited in plaintiff's brief.] We rule this point for the plaintiff.

III. We hold that no inference unfavorable to appellant can be drawn from the failure to put Horn, Karshner's attorney, on the witness stand. Plaintiff was fully possessed of the testimony he would give, because he had been a witness at the trial in the probate court. He could have been called by the plaintiff, had she desired his testimony. Indeed, the burden of proof being upon her (Williams v. Williams, 259 Mo. 1. c. 252), it was her duty to have called Horn as a witness. The same is true as to any other absent witness. The burden of calling them was upon the plaintiff.

*Failure to Call Witness.*

IV. It is plain from the statement of facts, that Karshner and the plaintiff sustained illicit relations long before July 10, 1913, when it is alleged the common-law contract of marriage was entered into between them. Under such circumstances, the law is well settled that their meretricious relation is presumed to continue, and the burden of proof is upon the plaintiff to satisfy the conscience of the court that a new, real relationship of husband and wife was thereafter by mutual agreement in good faith entered into between them. [Cargile v. Wood, 63 Mo. 1. c. 514.]

*Prior Illicit Relations.*

V. This court has frequently had occasion to define, and at this late date it would seem that it should be definitely settled, what constitute the elements of a marriage contract in this State. A short definition, which we again approve, is found in State v. Cooper, 103 Mo. 1. c. 273, where we said: "To constitute a valid marriage, either under the statute or at common law, there must be, *first,* one

*Elements of Contract.*

man and one woman capable of contracting; *second*, they must enter into a contract by which they assume the relation of *husband and wife for their joint lives, and they must both understand that neither one, nor both, can rescind the contract or destroy the relation.*" (Italics are ours).

VI.    The question this court has to decide is, therefore, whether the plaintiff has overcome the presumption against her, and proved,* to the satisfaction of the court, that after their illicit relations were commenced, she and Karshner entered into a marriage contract, having the elements above mentioned, in good faith.    [Cargile v. Wood, supra.] This is to be determined by a consideration of all the facts and circumstances before the court.    The only direct testimony is that of the plaintiff's daughter, who was then but thirteen years old.    She casually overheard part of a conversation between Karshner and her mother, who were in an adjoining room.    She says she paid no particular attention to it, that it was nobody's business, and never mentioned it thereafter to any one, until this suit was brought or contemplated three or four years thereafter, when she mentioned it to plaintiff's attorney.    So that, the only witness to this marriage contract was an unheeded, unheeding and uninvited child, who paid no particular attention to the words used, and thought so little of it afterwards that she never mentioned it to any one, until this suit was contemplated. She, too, now grown apace, is an interested witness, vitally concerned in the outcome of this suit.    Her testimony, if it stood alone, would be a frail structure, too weak to support the burden of proof, which the law, under the circumstances, casts upon the plaintiff.    But that plaintiff and Karshner never intended to enter into a marriage contract by any words·that they used at that time, if any were used, is shown by the great weight of the testimony and facts and circumstances in the record. In the first place, the record shows that neither of them

*Insufficient Evidence.*

had any special regard or respect for the marriage relation. Both of them had disregarded, as of little or no consequence, their marital obligations to their previous spouses. They cast them aside, "as a huntsman his pack." We also find from the evidence that both of them thereafter had illicit relations with others, and thus interpreted their own relations as if no marriage existed between them. Nor was there thereafter a general holding out by them, and a general reputation of living together as husband and wife. At Karshner's garage where, of all places, their real relations would have been most intimately known, and would have been most truthfully declared, they were not known as husband and wife, and did not claim to be. The great weight of the evidence is to that effect. At 1425 Central Street, where it is claimed their contract was made, they were not reputed to be, and did not hold themselves out at all as husband and wife, so far as shown by the evidence. But while at that place, we find that both denied that they were husband and wife. While they lived at the Cordova Hotel, their reputation among the people at that hotel was that they were husband and wife. But that was a respectable place where they could not have lived at all, had they not so represented themselves. Even while living there, November 18, 1913, Karshner dismissed the plaintiff from his room at the Hotel Edward, after midnight (and neither of them protested) on the charge by the clerk, that Karshner had a woman in his room, contrary to the rules, and demanded that Karshner dismiss her.

The next place at which they resided was the Kenilworth Flat, where their repute, as to whether or not they were husband and wife, was divided. Among tradesmen, with but one exception, they were generally known as husband and wife. When they appeared together in public places, such as automobile shows or parties, or at the clubs or hotels, or at hotels where they stopped together outside of Kansas City, they did represent

themselves as husband and wife.  These were all public places, and little weight is to be given to this testimony, because, as said in Williams v. Williams, 259 Mo. l. c. 252: "Their being able to find lodgment there undoubtedly depended upon the impression given out by them that they were married." So, plaintiff's getting a line of credit among the tradesmen depended on being represented as Karshner's wife.  Plaintiff's statement to Mrs. Lloyd in 1915, that she felt badly because her former husband, B. F. Perkins, was married again, for she always thought that she could go back to him any time she wanted to; also Karshner's statement in the same year to the witness Sutherland, that plaintiff was no relation of his, but that her name was Mrs. Perkins, show that there never had been any bona-fide change in their original illicit relations up to that time.  So, his own mother never heard of his being married to plaintiff.  Without going into further details, which are referred to in the statement of the case, up to the 1st day of May, 1916, and after the alleged contract of marriage, their repute and holding themselves out as husband and wife, was not uniform or general, but was divided, fragmentary and in spots.  A "mottled" repute and holding out is not sufficient to prove the matrimonial state. "Such repute does not meet the stringent requirements of the law." [Bishop v. Brittain Inv. Co., 229 Mo. l. c. 730.] "If there is a conflict in the repute, it will not establish the marriage." [GANTT, J., In Topper v. Perry, 197 Mo. l. c. 548.]  In Cargile v. Wood, 63 Mo. l. c. 514, this court said: "When the connection is illicit in its origin, the presumption is that it is likely to continue so, and if it is alleged that it was subsequently changed, it must be shown at what time it became lawful. [Clayton v. Wardell, 4 Const. 230.]  'When the connection was at first notoriously illicit,' said Lord ELDON in Cunningham v. Cunningham, (2 Dow. P. C. 482), 'and a change in the character of the connection must be operated, and the means employed for that purpose are such

as to leave half the world in doubt as to the relations, one-half thinking one way and the other half the other, at what time, in what circle, could it be said that there was such a habit and repute as raised the presumption that the parties had mutually consented to 'be husband and wife? He could not admit that mere cohabitation as man and woman was a cohabitation as husband and wife.' "

It cannot be said, therefore, that the evidence as to the relations of these parties prior to May 1, 1916, standing alone, established the existence of the marital relation at that time.

VII. But we hold, that all the facts and circumstances, all that was said and done by the parties, until Karshner's death, must be considered.

On May 1, 1916, appears the first written evidence of the relationship between the parties. On that day, Karshner gave plaintiff a check for $200, payable to *Miss* Olive Perkins, which she endorsed as "*Miss* Olive Perkins," and either that check, or the money from it, was deposited by her or Karshner in the Southwest National Bank of Commerce in the name of Olive Perkins. She drew checks on this account signed, "Miss Olive Perkins," until it was exhausted, the last check being July 14, 1916. The deposit slip opening the account was in Karshner's handwriting. On the same day, she signed a document stating she had, in effect, been simply Karshner's housekeeper, and claimed no right in his property; that *they were never married,* and never had lived together as husband and wife, and that in consideration of $200, the receipt of which she acknowledged, she released Karshner from all claims and demands. She not only signed this document, but at the same time signed an affidavit written on it, stating that her signature to the foregoing instrument was her free act and deed, and that "she is not now and never was or claimed to be the wife of said Pearl D. Karshner."

<div style="margin-left:0">

**Written Document.**

</div>

About May 8, 1916, Karshner engaged a room at the Bray Hotel, and took his trunk and clothes there, and plaintiff remained at the Kenilworth Flat. But there is evidence that they visited each other and plaintiff's daughter testified, that they slept together every night until he was taken to the hospital from the flat on June 8, 1916. There is, however, other testimony that he, at least part of the time, slept at the Bray Hotel. The suggestion of learned counsel that these parties could not divorce themselves by this document and affidavit of May 1st, implies that said papers were made for that purpose and that the parties thought that they could thus divorce themselves. If they had a contract, as to living together, believing that they themselves could thus dissolve it, such contract was not a marriage contract at all. If they believed they had thus dissolved a marriage contract, they intended to cohabit together illicitly thereafter, because plaintiff's own evidence shows that they did cohabit together thereafter, if not the same, yet substantially, as they did before. The obvious fact is, that transaction of May 1st simply shows that these parties had lived together and intended to continue to live together, whenever they felt so disposed—*out of wedlock.*

VIII. On his arrival at the hospital June 8th, 1916, Karshner or plaintiff gave the information put on the entrance slip, that his residence was 305 West 13th Street (Kenilworth Flat), that he was married and that his wife was his nearest relative. But shortly there-

**Denial in Will.** after he told the nurses that plaintiff was not his wife, and that he did not care to see her, and although she visited him frequently during the first ten days of his stay at the hospital she was an unwelcome guest. He also introduced the plaintiff to his mother who came from Ohio to his bedside, as Mrs. Perkins, and plaintiff made no protest, but nodded her assent thereto. His mother had never heard of her before, nor that he was married again.

When Karshner began to feel that the end was near, he called for his friend Oglebay and showed Oglebay a rough draft of his will and spoke of the provisions in it. Oglebay asked him if he was married and he said he was not. His will was duly executed a few days thereafter, June 26, 1916, and after making a devise to his mother, his attorney and his son, he then states in his will: "I want it known that I am a single man and unmarried; that my son Kenneth M. Karshner is my only child; that I have no other children or their descendants."

Thus, under the most solemn circumstances, did Karshner declare that he had never entered into any marriage contract· with the plaintiff. So that, the evidence shows that both the plaintiff, she under oath, and Karshner, with death waiting for him at the door while he wrote, revealed in writing in the most impressive manner possible, and clearest of terms, that their relationship to each was not that of husband and wife, and never had been.

We must rule, that the judgment below should be reversed with directions to the circuit court to render a judgment for the defendant, appellant here, to the effect, that plaintiff is not the widow of the decedent, and her· applications for allowances, or a share in his estate as such widow, should be denied.

It is accordingly ordered. *Brown* and *Ragland, CC.*, concur.

PER CURIAM:—The foregoing opinion of SMALL, C., is adopted as the opinion of the court. All of the judges concur, except *Woodson, J.*, absent.

## ON MOTION FOR RE-HEARING.

PER CURIAM:—A motion for re-hearing has been filed, urging, amongst other things, that this court has no jurisdiction of this appeal, because the amount involved does not exceed $7,500, and, therefore, appellate jurisdiction is vested in the Kansas City Court of Appeals. As our original opinion shows, the judgment upon the trial of plaintiff's claim for the widow's absolute property under the statute was also, by agreement of the parties, to determine her status as widow in the other claim she filed under the statute for one-half of the personal property of the deceased, upon final distribution. Consequently, the trial below, which required no special form of pleading, having originated in the probate court, was for all purposes, as between the plaintiff and the administrator, who held the title of the personal property of the estate, to determine plaintiff's status as widow, or not the widow, of Karshner under both claims filed by the plaintiff. The judgment of the lower court was rendered in pursuance of such agreement. Such judgment was not that plaintiff recover a certain sum as her absolute property as widow, under the claim filed for such absolute property, but that plaintiff "was at the death of the deceased, his wife, and entitled to receive such share or portion of his estate as is made and provided by the statutes of Missouri." It was the widow's right in the Karshner estate under both claims filed by the plaintiff and under all statutes of Missouri, which was submitted to and adjudged by the lower court, and from which judgment the appeal to this court was taken. It is the value of such right, therefore, which determines our jurisdiction. The record shows, that both parties admitted below, that the personal property of the Karshner estate exceeding $20,000 in value. The probate records introduced, showed the personal property to be worth over $30,000 in value. There is nothing showing any

*Appellate Jurisdiction.* (marginal)

indebtedness, except a judgment for $30 per month in favor of Josie I. Karshner, for support of Karshner's minor son, Kenneth. Mrs. Josie I. Karshner died since this case was brought to this court. Therefore, the amount involved in this controversy is one-half of the value of the personal estate, besides the widow's absolute. property. It is plain, that this amount exceeds $7,500, and that this court has jurisdiction of the appeal.

We have also carefully considered the other grounds presented in the motion for re-hearing and the brief in support thereof, but find nothing therein calling for any modification of our original opinion.

Respondent's motion for re-hearing is accordingly overruled. All concur, except *Woodson, J.*, absent.