LENA MICHLER, (Claimant) Appellant, v. KREY PACKING COMPANY, a Corporation, (Employer) Respondent, No. 42450—253 S. W. (2d) 136.

Court en Banc, December 8, 1952.

*Herbert Ziercher* and *Wayne C. Smith, Jr.*, for appellant.

*Baker & Reis, Ernest E. Baker* and *Robert C. Reis* for respondent.

*Frank J. Lahey* and *W. E. Freeland* for The Industrial Commission of Missouri, amicus curiae; *John D. Steele* of counsel.

710

HYDE, J.—Appeal from the Circuit Court judgment affirming an award of the Industrial Commission in favor of employer and against claimant on her claim as dependent widow of deceased employee Engelbert Michler. There is no dispute as to Michler being killed by an accident arising out of and in the course of his employment. (Sec. 287.120; statutory references are to RSMo 1949 and VAMS.) The decisive fact issue was whether claimant and Michler were ever married. Thus the principal question for decision on this appeal is whether a determination of this issue against claimant is "supported by competent and substantial evidence upon the whole record." (Sec. 22, Art. V, Const.) For the reasons hereinafter stated we think it is.

The evidence was heard by a referee under authority of Sec. 287.460. The referee found "that the employee left surviving him at the time of his death as his widow, Lena Michler, the claimant herein, and that she is his sole and total dependent." His award was $150.00 for burial expenses and $25.00 a week for 480 weeks. Upon review by the full Commission, the award of the referee was reversed and compensation denied. The finding of the Commission was: "We find from all the evidence that Lena Michler, claimant herein, failed to prove that she was ever legally married to Engelbert Michler, deceased employee; that said claimant therefore failed to prove that she was a dependent of said employee within the meaning of the Missouri Workmen's Compensation Law."

The facts in evidence, as stated in the opinion heretofore written herein in Division No. 2, which we adopt without quotation marks, and with some additions, are as follows:

Lena did not know how long she had known Michler or when she had met him, she only definitely admitted to a year or so before they were married. She said that in 1939, prior to their marriage, he was living in a room on Bremen and she lived on Ninth Street, in

St. Louis. She stated that the week in which the eighth day of June, 1939, fell was the week of his vacation from his employment with the Krey Packing Company and on that day, after considerable drinking in bars in St. Louis, they went to Illinois. Their original destination was a resort known as Long Lake or Pontoon Beach near the towns of Madison, Mitchell, Nameoki and Granite City in Madison County. She did not know when they started out that they were to be married, although she said: "I know I thought I would be, anyhow." She and Michler had discussed the subject and wanted to get married the year before but he did not have enough money to buy the furniture. She said "we decided it when we got to ranting around." She thought he had again mentioned the subject while they were yet in St. Louis, but between Madison and Mitchell he suggested getting married. In first testifying before the referee, she said that they left St. Louis about seven o'clock in the evening and went by interurban streetcar to Madison where they met some friends, Tony Vaginski, a tavern keeper, and his wife. There they had several drinks and between nine and ten o'clock went to Mitchell and there, in the next two hours, had several more drinks. By that time she "had had too much to drink" and her memory was hazy, but, she said, they went to another tavern in Vaginski's car, she did not know where, [138] and had more drinks. About one or two o'clock they were drinking coffee in a restaurant, and after that, for about an hour, they were in a tavern in Nameoki and finally they returned to Vaginski's tavern in Madison and had more drinks until about six o'clock in the morning when she and Michler returned to St. Louis.

Between Mitchell and Madison, Michler had said that they would get married but neither of them knew where to go and the Vaginskis told them to go to a minister in Nameoki. So about twelve o'clock, June 8, 1939, they went to a Baptist minister's home in Nameoki, Michler produced a license, and they were married. She did not remember the minister's name and could not describe him or his home. She signed the certificate, and so did Michler, the minister and the Vaginskis. She had the license or certificate for a number of years, but about three years ago Michler, in a fit of anger, tore it up and burned it. On cross-examination, she was reluctant to answer questions and finally walked out of the hearing. About thirty days later, her testimony was resumed. She then said that instead of returning to St. Louis the next morning they went to Long Lake, where there was a tavern, and spent the day, and possibly the night, at a resort operated by Mrs. Jones. When pressed for more accurate testimony as to all the taverns they had visited, how much they drank and where they spent the time she finally said, "If you felt like I did you would not remember it, either." In any event, when they returned to St. Louis for some time, accord-

ing to her, she continued living at her address on Ninth Street and Michler lived in his room on Bremen.

When she testified the second time Lena said, instead of going to Illinois by streetcar, that they went in Michler's car and they and the Vaginskis went from place to place in his car. At the coroner's inquest upon Michler's death Lena testified that she and Michler were married, not June 8, 1939, but on June 6, 1938 in a little town near Chicago. She said then that she had her marriage certificate and would produce it if necessary. The paymaster for the Krey Packing Company testified that the company had no paid vacations for employees in 1938; they did in 1939 and that year Michler took his vacation in October. The company's payroll records for the weeks which included June 6, 1938 and June 8, 1939 show that Michler worked forty hours each of those weeks, eight hours per working day. The week in which June 6, 1938 is included began on the 6th, on Monday, and the 8th day of June 1939 fell on Thursday. Lena did not take the required physical examination before obtaining a marriage license in Illinois. There is no record in the Madison County Clerk's office in Edwardsville of the issuance of a license to Lena and Michler or the return of a marriage certificate in accordance with the laws of Illinois. There is no Baptist Church in Nameoki (but there was one in nearby Granite City) and there is no Baptist minister in residence there. Mr. Curtiss, who had been the magistrate in Nameoki for sixteen years and who had authority to issue licenses and marry people, had no record of the issuance of a license to Lena and Michler, and had no record or knowledge of having married them. There was, however, another marriage license clerk in Granite City and one in Edwardsville, the county seat of Madison County. Neither Lena nor the employer produced anyone named Vaginski as a witness, but the employer produced Thomas Voloski, sometimes called "Black Tony", a tavern keeper in Madison. He had kept a tavern there since 1942 and was acquainted with Michler; he had known Michler when they both worked for the Krey Packing Company, even before that, when Tony was delivering ice. Michler was a patron of Voloski's tavern, and usually had "that lady" with him. Voloski did not know Lena's name, he did not know that Lena and Michler were married, and he did not go with them to get married. He had known the tavern keepers in Madison since 1936 and of the fifty-two then in Madison he had never known one whose name was Vaginski. Mrs. O. H. Jones who, with her husband, was the tavern keeper and resort owner at Long Lake did not know Lena but said that Lena and Michler did not spend a night at her place in 1939.

Michler once lived at 3614 N. 11th Street, some said in 1935 before he was divorced from his first wife, and some said that it was in 1936 after his divorce. The rooming house keeper who owned

the property said that Lena and Michler lived there two or three years, ''Well, that was in 1938,—'39, '37,—it was right along in there.'' Lena insistently denied that she had ever lived at that address with Michler. Michler's adult son and daughter said that they visited their father at the 11th Street address in 1935 and from all appearances Lena was living there with him. She prepared meals for his son there. His lifelong friend, Henry Grothman, and Long Lake associate, said that Michler brought Lena to Long Lake in 1935 and that after his divorce in December 1936, from all appearances, he and Lena lived together on 11th Street. He said he and his wife went with Michler and Lena to buy furniture when they were living on 11th Street. As late as February 14, 1940, Michler applied for life insurance and in his application he was designated ''single'' and his beneficiary was listed as Lena Miller, ''friend.'' This application was taken at 3614 North 11th Street. The policy which was issued on this application was changed in 1945 to read ''Lena Michler, wife.'' About the same time, an application was taken for another policy designating her as wife. The insurance agent, who took these applications, also collected the monthly premium payments from Michler. He said Lena was there when he took the 1940 application on 11th Street. He also said that later, when Michler was living in Jennings, he showed him a marriage license and said: ''Now you know we are married'', but that he did not see what names were on it.

Lena said that, after living separately for a while, as soon as they could afford to buy furniture they moved to 619 Harris Street where they lived for about a year and a half. They then moved to 2649 Huiskamp Avenue in Jennings, St. Louis County, and Lena was living there at the time of the hearing before the referee. She and Michler purchased the property, 2649 Huiskamp, which was deeded to them on September 5, 1941 as ''Engelbert Michler and Lena Michler, his wife.''. On the same day they executed a deed of trust on the property as husband and wife, securing the payment of sixty-six installment notes to their grantor. They procured fire insurance on the property and its contents as husband and wife. They moved into the property, furnished it and lived there as husband and wife until his death. Lena had charge accounts as his wife and Michler introduced Lena to various people as his wife. The County Assessor of St. Louis County said, ''Well, it was common talk about Engelbert Michler and her moving back to Jennings, married,'' and that, generally, they were reputed to be husband and wife. Michler's life was also insured for $1000 under his employer's group policy with the General American Life Insurance Company and his named beneficiary there was Lena, as ''wife.'' Michler's employment record with his employer, the Krey Packing Company, listed Lena as his wife, and his withholding exemption certificate, executed in 1944,

recited that Lena was his wife. It is conceded that Lena was legally divorced from her former husband in Kentucky in 1922, and Michler was divorced in 1936, so there was no impediment to their marriage.

Both parties seek to rely on presumptions. Claimant relies upon the presumption of a valid marriage arising from cohabitation, general repute and declarations and conduct of the parties, citing Thomson v. Thomson, (Mo. App.), 163 S. W. (2d) 792 and Osmak v. American Car and Foundry Co., 328 Mo. 159, 40 S. W. (2d) 714. (See also Annotations 34 A.L.R. 464, 77 A.L.R. 722, 14 A.L.R. (2d) 7; 35 Am. Jur. 326, Sec. 220; 55 C.J.S. 888, Sec. 43.) The employer urges that the relationship between Lena and Michler was meretricious in its inception and, therefore, it is presumed that such relations continued, citing Cargile v. Wood, 63 Mo. 501, 514; Imboden v. St. Louis Union Trust Co., 111 Mo. App. 220, 86 S. W. 263; Perkins v. Silverman, 284 Mo. 238, 223 S. W. 895. However, in view of claimant's positive testimony as to a ceremonial marriage on a definite date and the employer's evidence showing that there [140] was no such marriage, the issue must be determined upon all the facts presented by both parties as if neither presumption were ever applicable in the action. When substantial evidence is introduced by the party against whom a presumption operates controverting the presumed fact, then its existence or non existence is to be determined from the evidence, exactly as if no presumption had ever been operative in the case. In other words, such presumptions are procedural (placing the burden upon the party denying their truth to produce evidence) and not for consideration of the triers of the facts who have the function of determining what facts are proved by the evidence produced. (For effect of presumptions see State ex rel. Waters v. Hostetter, 344 Mo. 443, 126 S. W. (2d) 1164; State ex rel. Steinbruegge v. Hostetter, 342 Mo. 341, 115 S. W. (2d) 802; Ross v. St. Louis Dairy Co., 339 Mo. 982 and cases discussed therein; Brunswick v. Standard Accident Ins. Co., 278 Mo. 154, 213 S. W. 45; Mockowik v. Kansas City, St. J. & C.B.R. Co., 196 Mo. 550, 94 S. W. 256; 9 Wigmore on Evidence, 3rd Ed. 286-293, Secs. 2490-2493; Thayer, Preliminary Treatise on Evidence, Chap. 8, especially pp. 314, 316, 336, 346. Of course, the facts which give rise to the presumption remain in the case and are to be considered with other evidence for whatever probative value they may have. Thus the facts showing that after 1940 Michler introduced Lena as his wife, had her shown as his wife in insurance policies, employment records, and deeds, is substantial evidence corroborating her claim of marriage. However, she claims a valid marriage solely on the basis of a ceremonial marriage performed in Nameoki, Illinois, on June 8, 1939, (and does not claim there was any other marriage) so her status as Michler's widow must stand or fall upon the accept-

ance of that claim by the triers of the facts; and they must determine that issue upon consideration of all of the evidence in the case. Of course, as contended, when a marriage is once shown, there is a presumption that it was a valid marriage (like the Osmak case, 40 S. W. (2d), l.c. 717, where an admitted second marriage was presumed valid over a former marriage); but here the decisive question for the Commission was whether a June 1939 marriage *was shown* and this was the issue they were to decide from all the evidence in the case. In deciding it, they did not have to accept the testimony of claimant if there was a substantial basis from all the evidence for finding it untrue. Claimant, of course, had the burden of proof and the Commission was not required to accept her testimony as true. (See Meintz v. Arthur Morgan Trucking Co., 345 Mo. 251, 132 S. W. (2d) 1010, and cases cited.)

■ It is contended that the finding herein is necessarily based upon credibility of witnesses and that, since no witnesses appeared before the Commission, and all did appear before the referee, no deference is due the finding of the Commission; but that instead the finding of the referee on the fact issue should be accepted. However, it is the award of the Commission that is reviewed by the Courts and not the award of the referee. (Sec. 287.490.) It is suggested that Sec. 287.610 provides: "Any award by a referee upon an original hearing shall have the same force and effect * * * as provided elsewhere in this chapter for similar awards by the Commission or any member thereof"; but, of course, this means if not set aside by review proceedings under Sec. 287.480. Nevertheless, judicial review is on "the record of the cause" and Sec. 287.490 provides that this includes "all documents and papers on file in the matter" so that the referee's award, findings of fact and rulings of law are part of the record. We think the situation is correctly analyzed in the opinion of the United States Supreme Court in Universal Camera Corp. v. National Labor Relations Board, 340 U. S. 474, 71 S. Ct. 456, 95 L. Ed. 456. There the Court, considering federal statutes providing substantially the same scope of review as our constitutional provision (Sec. 22, Art. V), held that examiner's findings were a part of the record and a factor to be considered in determining whether the decision of the administrative tribunal was supported by [141] substantial evidence on the record taken as a whole.

The Court explained this as follows: "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's

than when he has reached the same conclusion. *The findings of the examiner are to be considered along with the consistency and, inherent probability of testimony.* The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is 'substantial.'" (Our italics.)

In this case credibility is important but credibility is not determined solely from the appearance and demeanor of the witness. Claimant's account of the time, place and circumstances of the marriage ceremony upon which she relies directly conflicts with impressive documentary evidence. The employer's records showed that Michler worked 40 hours during the week of June 8th, 1939 and did not take his vacation week until October. The insurance application of February 14, 1940, signed by Michler, shows him to be single and designates his beneficiary as "Lena Miller, friend." It gives his address as 3614 North 11th Street and the insurance agent (who was called as a witness by claimant) said Lena was there at the time. Claimant's account also directly conflicts with her own testimony at the inquest that she was married to Michler a year earlier at a town near Chicago. (For a case involving credibility in which this Court did not accept the report of its special commissioner who heard the witnesses, see In re Warden, 347 Mo. 196, 146 S. W. (2d) 874.) Claimant's testimony has many other inherent weaknesses and the testimony of Michler's children (although they had an adverse interest in making claim to the house in Jennings) and of Michler's longtime friends Grothman and Schmid, the insurance agent, is very persuasive. In view of all these factors, we certainly cannot say a finding that claimant and Michler were never married would not be supported by substantial evidence on the whole record. In fact, this seems to be a case in which a decision either way would be so supported.

Our constitutional provision (Sec. 22, Art. V) "does not mean that the reviewing court may substitute its own judgment on the evidence for that of the administrative tribunal. But it does authorize it to decide whether such tribunal could have reasonably made its findings, and reached its result, upon consideration of all of the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence." (Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S. W. (2d) 647; Seabaugh's Dependents v. Garver Lumber Co., 355 Mo. 1153, 200 S. W. (2d) 55.) After giving effect to the factor of the referee's finding to the contrary, we cannot say that the Commission could not have reasonably reached its result upon consideration of all of the evidence before it or that this result is clearly contrary to the overwhelming weight of the evidence. We find more inherent weaknesses in claimant's

testimony than appears in Hartman v. Valier & Spies Milling Co., 356 Mo. 424, 202 S. W. (2d) 1, relied on by claimant, and also find conflicting documentary evidence herein that was not present in that case. In the Hartman case, it is noted that the fact of marriage was strongly supported by Hartman, only four months later, taking out life insurance in favor of claimant therein as his wife. This case is just the opposite because Michler, eight months after the date of the claimed ceremonial marriage herein, took out life insurance designating claimant by her maiden name and describing her as [142] "friend." Thus, in this feature, this case is more like Dinkelman v. Hovekamp, 336 Mo. 567, 80 S. W. (2d) 681, distinguished in the Hartman case. We must, therefore, hold that a finding by the Commission that claimant and Michler were never married would be supported by substantial evidence upon the whole record.

We have considered the Commission's finding that claimant "failed to prove that she was ever legally married to Engelbert Michler, etc." as a finding, upon all the evidence, that claimant was never legally married to Engelbert Michler and was not a dependent of said deceased employee. (See Scott v. Wheelock Bros., 357 Mo. 480, 485, 209 S. W. (2d) 149, 152; Doughton v. Marland Refining Co., 331 Mo. 280, 289, 53 S. W. (2d) 236, 240.) Nevertheless, we think that is a confusing and ambiguous way to state a finding of fact and sounds like merely a determination that claimant did not make a prima facie case. (Our view as stated is that the record was sufficient to support a finding either way on the decisive fact issue.) Findings of fact are required by Secs. 287.460 and 287.480; and one of the questions on appeal, as provided by Sec. 287.490, is whether the facts found by the Commission support the award. Thus we think these statutory provisions contemplate an unequivocal affirmative finding as to what the facts are. The reasons for such findings by administrative tribunals were thus clearly stated by Chief Justice Hughes in Florida v. United States, 282 U. S. 194, 51 S. Ct. 119, 75 L. Ed. 291: "The Commission is the fact finding body, and the Court examines the evidence not to make findings for the Commission but to ascertain whether its findings are properly supported." (However, making new findings seems to be what the circuit court did in the Hartman case, 202 S. W. (2d), l.c. 2 and 7.) Our review of decisions of administrative tribunals is different from our traditional review of equity cases of circuit courts because the appellate court considers such cases de novo and is not bound by the chancellor's findings of facts but may make its own findings. (See cases under Appeal & Error, Sec. 895, West's Missouri Digest.) Sec. 287.490 provides that "the findings of fact made by the commission within its powers shall be conclusive and binding", which

means, of course, if they are supported by substantial evidence on the whole record.

That is why the Commission should make a sufficient finding to show whether the basis of their decision was an issue of fact or a question of law. For example, if we had a finding that there was no marriage ceremony performed to marry claimant and Engelbert Michler in June 1939 in Illinois, we would know that the decision was solely on this fact issue. A finding merely that claimant was never *legally* married at least leaves a doubt as to whether the decision may be based upon the Commission's theory of what is required to constitute a legal marriage under the law of Illinois; that is: on a question of law and not on an issue of fact. As the Hartman case (202 S. W. (2d), l.c. 6) points out, even a sham ceremony could create a valid marriage under Sec. 451.040 if claimant was deceived by it. In the Marland case (53 S. W. (2d) l.c. 237) there were detailed findings of fact in question and answer form (showing the factual basis of the decision) in addition to the general finding that claimant had failed to prove the ultimate fact. Likewise, in Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601, usually cited as the authority for only a general finding, there were findings as to the circumstances, in question and answer form. We have, as stated in Scott v. Wheelock Bros., 357 Mo. 480, 209 S. W. (2d), l.c. 152, placed the burden upon the parties to request findings but there have been cases such as Smith v. Smith, 361 Mo. 894, 237 S. W. (2d) 84, which we have had to remand to the Commission because of doubt as to the basis of their decision. A fact finding in the Smith case that there was no marriage ceremony performed to marry the claimant therein and Charles Smith in Arkansas, would have made remand in that case unnecessary. (See findings set out in opinion in Griggs v. Pullman Co., (Mo. App.), 40 S. W. (2d) 463.) In any case, findings should be sufficient to show how the controlling issues have been decided.

On this question, Mr. Justice Cardozo, in United States v. Chicago, M., St. P. & P. R. Co., 294 U. S. 499, 55 S. Ct. 462, 79 L. Ed. 1023, said concerning a report of the Interstate Commerce Commission, which did not clearly show the basis of the decision: "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." More recently Mr. Justice Frankfurter, in quoting this comment, said in City of Yonkers v. United States, 320 U. S. 685, 64 S. Ct. 327, 88 L. Ed. 400: "But courts have also spoken of the need of findings as the basis of validity of an order by the Interstate Commerce Commission in the absence of a Congressional direction for findings. The requirement of findings in such a context is merely part of the need for courts to know what it is that the Commission has really determined in order that they may know what to review." In Craddock's case, 310 Mass. 116,

37 N. E. (2d) 508, 146 A. L. R. 116, involving the status as a de-pendent of a wife living apart from her husband, the Court remanded the case because findings of the Industrial Accident Board were "mere general conclusions unaccompanied by a single finding of fact as a basis to support them." The Court said: "The element of the credibility of the witnesses, which was for the board, enters into the disposition of this phase of the case. In this situation we cannot, from the two naked general conclusions made by the board, 'determine with reasonable certainty whether or not correct rules of law have been applied to facts which could properly be found * * * ' and such a determination 'is a necessary part of the judicial review for which the Workmen's Compensation Act provides.'" (See also Annotations 146 A. L. R. 124, 146 A. L. R. 209; Administrative Law—Davis, Secs. 162-170.) And see Benjamin —Administrative Adjudication in the State of New York (1942), as follows: "Intelligent judicial review of a quasi-judicial determination is possible only if the deciding officer has made findings of fact which show the actual grounds of decision, — findings sufficiently specific so that the reviewing court may judge, first, whether the findings themselves are supported by the evidence in the record of the quasi-judicial hearing and, second, whether the facts so found are legally sufficient to support the determination. Primarily to provide the necessary basis for intelligent judicial review, therefore, the courts have laid down a requirement that such findings of fact be made. (Citing cases.) Such findings are required whether or not the departmental statute governing the procedure of the particular agency contains specific provision for findings of fact, as some statutes do." In fairness to claimant, we think the Commission should make findings sufficient to show whether it denies her claim on a question of law or an issue of fact, either or both.

The judgment affirming the Commission's award is reversed and the cause remanded to the circuit court with directions to remand to the Commission for further proceedings in accordance with this opinion. All concur.