**CUPPLES HESSE CORPORATION,**
Appellant,

v.

**STATE TAX COMMISSION of Missouri: James M. Robertson, John A. Williams, and J. Ralph Hutchison, the Duly Appointed, Qualified, and Acting Members of the State Tax Commission of Missouri; Harold Jaeger, Assessor of the City of St. Louis, Missouri, and Del L. Bannister, Collector of Taxes, City of St. Louis, Missouri, Respondents.**

No. 47370.

Supreme Court of Missouri,

Division No. 2.

Dec. 14, 1959.

Fordyce, Mayne, Hartman, Renard &
Stribling, Joseph Renard, Robert P. Stanis-
law, St. Louis, for appellant.

John M. Dalton, Atty. Gen., Donal D.
Guffey, Asst. Atty. Gen., for respondent,
State Tax Commission of Missouri.

Thomas J. Neenan, City Counselor, Thomas F. McGuire, Asso. City Counselor, David S. Hemenway, Asst. City Counselor, St. Louis, for respondents, John H. Poelker, Assessor, Del L. Bannister, Collector of Taxes, and The City of St. Louis.

EAGER, Judge.

This is an appeal from a judgment sustaining the decision of the State Tax Commission upon a petition for review under sections 536.100–536.140 (all statutory references are to RSMo 1949 and V.A.M.S.). The matter involves the 1956 assessment on certain industrial property in the City of St. Louis located, generally, between Penrose Street and Brown Avenue, and fronting in part on Kingshighway. The land consists of approximately five acres and it is improved by substantial buildings. The 1956 assessment on the land (as adjusted by the Board of Equalization) was $92,010, and on the improvements, $662,760. The petition sought relief on both the land and the buildings, but the objections to the assessment of the land have been abandoned here. The complaint made in the petition for review was that the assessment was discriminatory and oppressive in that residential property in the immediate area, and also other industrial property in the area, had not been assessed at values proportionate to that placed on petitioner's property, thus violating the requirement of uniformity in taxation; also, that the methods of assessment were arbitrary and illegal. The hearing before the State Tax Commission was held in St. Louis on September 10, 1956. All the evidence was adduced by petitioner except certain photographs of the buildings which were offered by respondents. Any attempt to digest the evidence is complicated by the fact that most of it involved land values and the methods of assessment thereof, whereas all this has now become moot; some of this evidence is difficult to separate, and certain phases of the evidence were not fully developed.

In 1946 the assessor apparently began an entirely new real estate assessment; the method of assessing industrial land was shown in much detail, although now immaterial. On industrial buildings he and his staff used the "American Appraisal System for Determining Costs," and the reproduction cost basis of 1942, as shown for the St. Louis area. On residence property they used a formula from "Boeckh's Manual of Property Appraisement" with the 1937 "Base Price * * * Reproduction Cost" prevailing in the St. Louis area. The explanation given for the diversity in the dates used on reproduction costs was, in substance: that although rent controls had been imposed on residential properties about 1942, most of the owners had not then adjusted their rents from the 1936–37 basis to the 1942 level of rents, and the assessor thought it fair to "hold" those values, since rent controls were still in effect in 1946; and that, although rent controls had been lifted some years before the hearing, "we have only so many men." The Supervisor of Assessments testified that the equalizing of assessments did not "necessarily" suffer from this distinction in dates, and that the "Industrials" were "in balance." Commercial property was assessed on a different basis. The Supervisor further testified that they sought to establish the "actual value" on all property, as distinguished from "market value" (which he apparently regarded as evidenced by actual sales) and that it was impossible to determine the sale value of each individual piece of property, since the sale price on any given tract might vary widely within a period of one year; that the factors affecting the values of residential, industrial and commercial properties are materially different.

A real estate appraiser of considerable experience testified for petitioner. So far as material, his testimony was: that he appraised this property in 1953 in connection with a refinancing project; that he valued the three buildings at $373,565, $370,119, and $682,487, respectively; that the respective

assessments on these were $114,000, $115,-750, and $433,000, constituting assessments at 30.6%, 31.2% and 63.5% of value, respectively, and an average assessment of 46.5% of value; that he used a 1953 Reproduction Cost on "Boeckh's Index," with certain supporting tests, and a depreciation of approximately 1% per year; that appraisers generally use different "approaches" and recognize different factors of valuation in appraising residential, commercial and industrial property; that the new building (assessed at $433,000) "is about the only portion that appears out of line" with others and with the residential property referred to in the evidence; but that in his opinion that tract was "out of line." Much of the witness' testimony was on land values; on cross-examination he stated that 1956 construction costs were perhaps 2–3% higher than 1953 costs, but that the subsequent depreciation would offset that; in general, he thought that the assessor had "done a very good job" in the time available to him, and that the one error they had made was in the "New Building," referred to above.

An exhibit offered by petitioner (Pet. Ex. 7) showed the assessments and supposed sale prices of 34 residential properties in four city blocks in the immediate area of petitioner's property; this exhibit had been prepared by a deputy assessor at petitioner's request. The deputy testified that he had no personal knowledge of the sales and had taken the sale prices from documentary stamps on the deeds. The rates of assessment to sales, as shown on this list, varied from 16.6% to 50.4% and averaged 31.8% on the 34 sales. At no time did the assessor-witnesses testify that any property or properties were assessed at any certain percentage (or percentages) of value. The manuals used by the assessor in fixing reproduction costs were not introduced in evidence, nor was there any explanation of the methods or systems thus provided; in other words, there was no elaboration or explanation of the practical end results of the use of the Boeckh's 1937

Reproduction Costs on residences and the 1942 American Appraisal reproduction cost on industrial buildings. And except for a rather ambiguous statement to the contrary to be mentioned later, it is not shown whether this actually resulted in proportionately lower valuations (and assessments) on residential property. It further appeared that some form of reassessment of residential property was in progress at the time of the hearing, but uncompleted.

■ We have jurisdiction because the matter involves a construction of the revenue laws. Koplar v. State Tax Commission, Mo., 321 S.W.2d 686; Foster Bros. Mfg. Co. v. State Tax Commission, Mo., 319 S.W.2d 590. Petitioner insists here that the decision of the Tax Commission is not supported by competent and substantial evidence; and therein, it says that any presumption of validity inhering in the assessment disappeared when evidence was introduced to show an unlawful discrimination. More specifically, it claims that a discrimination was shown by evidence of the use of 1937 reproduction costs in residential valuations and 1942 reproduction costs on industrial buildings.

■ We need not discuss the authorities cited in support of the requirement of uniformity in taxation. Art. 10, § 3, Mo. Constitution, V.A.M.S. We recognize, of course, that there are no "subclassifications" of real estate for the purpose of taxation (Art. 10, § 4(a)). While it has been said that equality is required in the "mode of assessment" (84 C.J.S. Taxation § 30, p. 94), we construe this to mean that modes or methods are required which produce uniform results. In one of the cases cited by petitioner it is said: "A difference in the methods or yardsticks or formulas used in ascertaining and determining actual or market value does not prove lack of uniformity if there is a reasonable, practical and just basis for the application of different methods or formulas." Hammermill Paper Co. v. City of Erie, 372 Pa. 85, 92 A.2d 422, loc. cit. 429, certiorari denied, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1367.

At some expense in time and space, we reiterate here certain of the basic principles applicable to the review of assessments generally. There is no such thing in assessments as an absolute "true value," and an assessment is, at best, a mere estimate; a presumption exists that the assessed value is correct, and the courts have no right to substitute their judgments, as such, for the values fixed by the assessor or by reviewing boards. State ex rel. Thompson v. Bethards, Banc, 320 Mo. 1164, 9 S.W.2d 603; Ulman v. Evans, Mo., 247 S.W.2d 693; May Dept. Stores Co. v. State Tax Commission, Mo., 308 S.W.2d 748; and a taxpayer has the burden of establishing a discrimination. May, supra. A mere overvaluation of a specific property does not establish a discrimination in the absence of a showing of an intentional plan of discrimination or a showing that there is an undervaluation in the average assessment, or that other property generally is undervalued. Jefferson City Bridge & Transit Co. v. Blaser, 318 Mo. 373, 300 S. W. 778, 784; May v. Tax Commission, supra. It is sometimes stated that the assessment of petitioner's property must, in the absence of an intentional plan or design of discrimination, be so grossly excessive "as to be entirely inconsistent with an honest exercise of judgment." St. Louis Electric Bridge Co. v. Koeln, 315 Mo. 424, 287 S.W. 427, 429.

Petitioner relies very largely upon the case of Koplar v. State Tax Commission, Mo., 321 S.W.2d 686. There the assessor admitted very frankly that he had assessed downtown office buildings in Kansas City at a greater percentage of true value than any other real estate in the county. The court held that the admitted practice of assessing downtown office buildings at a higher percentage of the assessor's own valuation was discriminatory, and that this admitted discrimination rebutted any presumption of validity in the assessment. We have no such case here.

Petitioner's own expert witness complained only of the overvaluation of one building. There was no evidence whatever in this case of the use of any percentages of value as the basis for or means of making any assessment,—industrial, residential or commercial, on land or buildings. It is contended, primarily, that the use of Boeckh's Manual with 1937 reproduction costs for residences and the American Appraisal System with 1942 reproduction costs for industrial buildings constituted, in itself, a discrimination. The difficulty with this contention is that the evidence did not go far enough to demonstrate a discrimination in the end results of the assessments on residences and of those on industrial buildings. We cannot say whether or not there was some compensating factor or factors in one or the other (or both) of the two methods which neutralized the apparent distinction. Here, as is often the case, the evidence adduced before the Tax Commission left much to be desired. It disclosed, however, that the assessor thought the selection of the different dates was fair at the time; this negatives any idea of an intentional and fraudulent discrimination. It would seem that the complaint actually made here is of the failure to reassess later. The courts cannot always regulate that question, and sometimes reassessments must, as a practical matter, be made piecemeal (May, supra, 308 S.W.2d loc. cit. 760). We may know judicially that there was some increase in building costs from 1937 to 1942, but the failure to show the practical results of the two methods renders this point immaterial. And certainly, were it material, we would decline to take judicial notice, as requested, of the highly technical publication which petitioner sends here entitled "A Study in Relative Construction Costs," by "E. H. Boeckh & Associates, Inc." This was not introduced in evidence, and it is apparently sent here in an attempt to supply deficiencies in the evidence. The proffered information is certainly not a matter of common knowledge. We are urged to "refresh" our recollection from this repository of statistical facts. We can-

not create a technical knowledge in the first instance by reference to technical publications. The refreshing of one's recollection or the verification of a matter of general information by reference to such publications as dictionaries or encyclopedias is a wholly different thing from taking judicial notice of a fact merely because it may be found in some specialized and technical publication. State ex rel. F. T. O'Dell Construction Co. v. Hostetter, 340 Mo. 1155, 104 S.W.2d 671. And, incidentally, when looking backward from a 1956 assessment, the difference between the reproduction costs of 1937 and of 1942 seems somewhat remote and intangible. Other elements had probably intervened by then.

The Supervisor of Assessments testified that the use of the methods complained of did not "necessarily" result in any inequality. Counsel did not see fit to follow this up by requiring an explanation of the divergent methods, or by bringing out in plain and simple language the real effect and end results of the use of the different cost figures and different methods. The evidence did not, in itself, automatically establish a discrimination. Nor did counsel ask for an explanation when this witness testified that our "industrials" are "in balance."

We have determined that the evidence thus produced by petitioner was not substantial. It did not show a discriminatory result by reason of the methods used. It did not show that other property (residential or industrial) generally, or on the average, was undervalued; indeed there was no evidence of the values of other property generally. A list of the assessments on 34 isolated residence properties was introduced. The assessments varied from 16.16% to 50.4% of the supposed sale values (P.Ex. 7). Assuming the competency of this exhibit, it is wholly insufficient as evidence of the basis of residential assessments in the City of St. Louis. Much is said in the case of May Dept.

Stores Co. v. State Tax Commission, 308 S.W.2d 748, 761, which is applicable on this point, but we shall not encumber this opinion by quoting from it. The variation in the percentage of residential assessments (even if the exhibit is accurate) disproves any uniform design to favor that type of property. The evidence certainly did not show that the assessment of petitioner's property was so "grossly excessive" as to be inconsistent with an honest exercise of judgment. It would be rank speculation to hold, on this evidence, that residence properties in St. Louis, either generally or in this particular area, were assessed at 31.8% (the average of 34 tracts from P. Ex. 7) of "true value," or that industrial properties (or even petitioner's property) were assessed at a higher percentage than the residential property generally. Much of counsel's argument depends upon the valuation of one building as fixed by petitioner's sole expert and upon the percentage of the assessment when based on that valuation. The Tax Commission was at liberty to disbelieve that testimony (May Dept. Stores Co. v. State Tax Commission, Mo., 308 S.W.2d 748, 761), though it could not shut its eyes and act upon whim and without reason (Humphrey v. State Dept. of Public Health & Welfare, Mo.App., 286 S.W.2d 563). If no credit is given to that valuation, all comparisons attempted here must fail. There is no showing here, and we certainly may not assume, that petitioner's property was assessed at a greater proportion of "true value" than was other property generally; and this is true whether we attempt to compare its assessment with that of residential property or with that of other industrial property.

Petitioner argues at some length that the presumption of the validity of the assessment disappeared upon the presentation of evidence of discrimination. It cites: Koplar v. State Tax Commission, Mo., 321 S.W.2d 686; Michler v. Krey Packing Co., Banc, 363 Mo. 707, 253 S.W. 2d 136, and other cases. We recognize the

702

principle. But it requires substantial controverting evidence to obliterate the presumption. Michler, supra; State ex rel. Steinbruegge v. Hostetter, Banc, 342 Mo. 341, 115 S.W.2d 802, 804; State ex rel. Waters v. Hostetter, Banc, 344 Mo. 443, 126 S.W.2d 1164, 1166. Substantial evidence is that evidence which, if true, "has probative force upon the issues * * *," and from which the trier of fact can reasonably decide the case on the fact issues. Collins v. Division of Welfare, 364 Mo. 1032, 270 S.W.2d 817, cited by petitioner. The evidence of petitioner here failed to show either discrimination or a valuation which was excessive when compared with other real estate generally; more specifically, it did not show either of these vital elements in such a manner as even to sustain a fact finding of invalidity in the assessment. In such a situation, the presumption is not overcome. But even were we to hold that it had been overcome, the burden of proof on the facts and inferences would still rest on petitioner, for it is the moving party seeking affirmative relief. This evidence would not sustain the burden. Compare Ellis v. State Dept. of Public Health & Welfare, 365 Mo. 614, 285 S.W.2d 634.

In its conclusions of law, the Commission determined that the evidence adduced by the petitioner did not show that the assessment was "unlawful, unfair, improper, arbitrary or capricious," and it confirmed the assessments as fixed by the Board of Equalization. Petitioner asserts here that this part of the decision is an affirmative finding that the assessment was lawful and fair, and that it is not supported by competent and substantial evidence; it cites Scott v. Wheelock Bros., 357 Mo. 480, 209 S.W.2d 149. That was a Workmen's Compensation matter. The Commission had found that the claimant had "failed to prove" dependency. No presumption was

involved. The court there held that the decision was a finding of ultimate facts, that the evidence supported contrary inferences, and that the decision was not a mere finding that the claimant's evidence was not credible. The case is not sufficiently similar to ours to be binding, or particularly persuasive.

■ The Tax Commission acts in a judicial capacity. May Dept. Stores Co. v. State Tax Commission, Mo., 308 S.W. 2d 748, loc. cit. 757; State ex rel. Young v. F. W. Woolworth Co., 348 Mo. 1180, 159 S.W.2d 297. We construe this decision to be a holding that petitioner's evidence was legally insufficient to overcome the presumption of validity inhering in the assessment. In Koplar (supra), also cited by petitioner, the Tax Commission arrived at a conclusion similar to that here, but the Commission was clearly in error there in holding that petitioners made no case, because of the affirmative admissions made by the assessor showing the use of different percentages as applied to his own valuations; the Commission did not purport to disbelieve that evidence, and certainly the petitioners' evidence did not negative it. For this reason the court held that there was no competent and substantial evidence "to support the *decisions* of the Commission * * *" (italics ours), meaning, as we take it, that there was substantial evidence to show the invalidity of the assessments, but none to the contrary. This was necessarily true, for the admissions of the assessor, per se, constituted substantial evidence of such invalidity, and, from their very nature, these could not be and were not controverted.

The foregoing disposes of the contentions made. The judgment will be affirmed, and it is so ordered.

All concur.