**Leslie J. DEFFENDOLL, Employee, Claimant-Appellant,**

v.

**STUPP BROTHERS BRIDGE & IRON COMPANY, Employer, and Employers Mutual Casualty Company, Insurer, Respondents.**

**No. 32647.**

St. Louis Court of Appeals.

Missouri.

April 18, 1967.

Motion for Rehearing or to Transfer to Supreme Court Denied May 18, 1967.

Douglas W. O'Neill, St. Louis, for claimant-appellant.

Luke, Cunliff, Wilson, Herr & Chavaux, St. Louis, for respondents.

ANDERSON, Presiding Judge.

This is an appeal from a judgment of the Circuit Court of the City of St. Louis, affirming the order of the Industrial Commission denying compensation to claimant, Leslie J. Deffendoll, on his claim for workmen's compensation benefits against his employer, Stupp Brothers Bridge and Iron Company and its insurance carrier, Employers Mutual Casualty Company.

The claim was filed June 9, 1964. It was signed, "Leslie Deffendoll by Max M. Librach." Milton R. Fox and Max M. Librach were designated in said claim as claimant's attorneys. The claim alleged the date of the accident as April 25, 1964; that the part of the body injured was the "back and entire body;" and that the accident happened when claimant was employed as an iron worker's helper and while so employed, claimant "slipped into track and tripped over against an iron rail." The matter was heard before the Referee on a Second Amended Claim filed January 27, 1965. This claim was signed by claimant, and Douglas W. O'Neill was designated therein as his attorney. In said claim, the injury alleged was alleged to be, "low back strain and herniated discs." Temporary disability to date was stated to be 30 weeks and the nature of permanent injury was alleged to be "low back strain and herniated disc of back, disabling pain in legs and low back;" and that the accident happened when "employee was riveting a railroad trestle floor, and as he reached down to pick up an air wrench he slipped on metal chips on a narrow gauge railroad track that ran through the factory, lost his balance and fell twisting and wrenching his back."

The Employer and Insurer filed an answer which admitted that claimant was an employee of Stupp Brothers Bridge and Iron Company; and that the parties were operating under and subject to the provisions of the Missouri Workmen's Compensation Law. These admissions were followed by a general denial of each and every other allegation contained in said Second Amended Claim.

The matter came on for hearing before a Referee of the Commission and on June 23, 1965, the Referee found in favor of the Employer and Insurer reciting that, "I find from all of the evidence that Leslie J. Deffendoll, employee herein, did not sustain an accident on April 25, 1964, arising out of and in the course of his employment with Stupp Brothers Bridge and Iron Company. Compensation, therefore is denied."

On June 24, 1965, claimant filed an application for review by the Industrial Commission. Thereafter, the Commission upon

review, adopted the Referee's findings of fact, his rulings and conclusions of law and affirmed said Referee. Claimant, in due time, appealed to the Circuit Court. The latter, as heretofore stated, affirmed, and from the judgment of affirmance the appeal to this court was taken.

Appellant contends that a statement obtained by respondents from claimant should not be considered upon review because it was improperly admitted in evidence, and that with its elimination from consideration the award was contrary to the overwhelming weight of the evidence.

At the hearing before the Referee it was admitted by the parties that on April 25, 1964, Stupp Brothers Bridge and Iron Company was an employer operating under the provisions of the Missouri Workmen's Compensation Law; that any liability of Stupp Brothers under the law was fully insured by Employers Mutual Casualty Company; that on April 25, 1964, claimant was an employee of Stupp Brothers and was working under the provisions of the Missouri Workmen's Compensation Law; that a claim for compensation under said law was filed within the time prescribed by law; and that the employee's average weekly wage was in excess of $71.25.

Claimant testified he went to work for Stupp Brothers on February 25, 1964, and on April 25, 1964, was working in the rivet shop. He further testified that on the latter date, he used an air wrench to tighten bolts; that after he had tightened the bolts, he laid down the wrench and later picked it up; that while in the process of picking it up his foot slipped on metal chips on the floor and he fell; that he went down on his right knee and his left foot caught in one of the rails of a narrow gauge railroad track that ran through the shop preventing him from falling all the way; and that on the way down his body turned. He further stated that after the fall he could not stand erect; that two of his fellow employees assisted him to the plant dispensary; that the nurse there sat him on a chair and

called Dr. Benjamin, the company doctor; that the nurse and two clerks from the company office took him to Dr. Benjamin's office; that Dr. Benjamin took one x-ray and told claimant he had a ruptured disc; and that he was then that same day, taken by ambulance to Alexian Brothers Hospital; that he remained in the hospital until May 5, 1964, but re-entered the next day and stayed until May 10, 1964; that he was hospitalized at said hospital again from October 26, 1964 through November 11, 1964, and again from November 23, 1964 through December 3, 1964; that from April 25, 1964 to April 29, 1964, he was in traction; and on April 28, 1964, a myelogram was performed. Claimant further testified that on April 30, 1964 one of his doctors performed an operation. He did not reveal the nature of the operation. During his stay in the hospital which began October 26, his treatment consisted of back manipulation. During his stay in the hospital which began November 23, his doctors performed a laminectomy operation. Claimant did no work after the date of the alleged injury until August 18, 1964, when he went to work for Falstaff Brewing Company. He worked there until he went to the hospital on October 23, 1964. He returned to work at Falstaff on January 21, 1965.

Claimant further testified that Stupp Brothers terminated his employment in May, 1964, when he got out of the hospital. He claimed lost wages from April 25, 1964 to August 18, 1964 when he went to work for Falstaff, and from October 26, 1964 when he re-entered the hospital until January 21, 1965, the day he returned to work at Falstaff. Claimant testified that during all this time, he suffered severe pain in his back and right leg. He further testified that his back still bothered him; that he had to quit a night job at Complete Auto Transfer after working one night because his back hurt him so bad; that his lifting is limited as compared to his ability in that respect before the accident; and that if he walks too much he has to sit down because

of pain in his back. Dr. William A. Stephens testified that he rated claimant's disability as being 30% of a man as a whole, and in response to a hypothetical question stated that the accident described caused his present condition.

The statement which claimant contends was not admissible was taken April 29, 1964, while claimant was in the hospital. It was in question and answer form. The questions were asked by Adrian DeYong, Jr., a member of the bar who was at that time employed by the attorneys for the employer and insurer. The question and answers thereto were taken down in shorthand by Mr. Frederick W. Schaefer, a Court Reporter and later transcribed by him. The parts material to the issues are as follows: "Q. Let me ask you this, what happened? A. Well, I finished tightening bolts on the diaphram, and I reached down and I picked up this air wrench, it was maybe ten, fifteen pounds. I just reached down and picked it up. I have done that a hundred times, I guess, and when I picked it up I felt the sharp pain in my back and that was it. I straightened up once and it was so doggone painful I just had to naturally bend back over again, you know, and I told the guy I was working with about it. He told me to go over to the nurse, and then I found out I couldn't put any weight on the side. Q. You picked up an air wrench of ten or fifteen pounds? A. Yes, sir. Q. Did you slip or fall? A. I never slipped. I don't recall any slipping or anything. * * * A. * * * Heck, I do something like that a hundred times. I have lifted a lot of weight, but none of it ever did hit me like this did. I couldn't tell you how it happened to save my life other than, you know, lifting up that wrench. Q. I believe you said there was no slip or fall or anything? A. I don't think there was. Q. What were you standing on? * * * A. Concrete floor. Q. Was it wet or anything? A. No, see, we have got tracks that run in there. It all happened so fast I could have slipped on a track. I don't know. I wouldn't swear that I didn't and I wouldn't swear that I did. All I know I reached over to pick up that gun and when I did I got it right in the middle of my back. Q. Were you bent over when this happened or straight? A. I think I was bending over, I'm not sure. Q. Had you started to straighten up? A. I was lifting it up when it happened. I am pretty sure I—sometimes it's a little hard to remember, but I am sure I was bending over and I picked it up like that, and when I did I got it in the back. Q. Did you remain standing? A. Yes, not straight. Q. But, I mean, you remained on your feet? A. I was leaned over, see, lean against this beam, and I started to straighten up, and I tried to straighten up, and I did, and it hurt too bad so I just leaned back over again. Q. But, I mean, you didn't fall all the way down or anything like that? A. No. * * * Q. Was this a straight lift or were you twisting as you came up? A. No, I think it was just an ordinary straight lift. I don't know, it could have been twisted. See, it's hard to remember something like that, you know. I don't think I was twisted. * * * I could have been turned a little bit or something, I wouldn't swear to it. Q. But you don't know? A. I don't know, this happened so quick. * * * Q. You were just lifting a ten to fifteen pound air wrench? A. Right. Q. No slip or fall? A. None that I know of. Q. Were there any wet places on the floor, for example? A. No. It's like I say, the track could have been slippery, it's steel. Q. Is that a raised track or is it flush in the concrete? A. Well, its about flush, I would call it. Q. But there was no accident that you can think of? A. None that I can think of."

Appellant's first point seems to be that the statement should not be considered on review because it was shown that at the time it was taken, claimant was in such pain and so far under the influence of drugs that his mind was confused to the extent it rendered said statement wholly unreliable and therefore inadmissible.

Claimant testified that on April 29, 1964, the date the statement was taken, he was given two "shots," one early in the morning and one at 12:30 p. m., and that between "shots" he was given "pain pills." The nurse's notes of that day, which was a part of the hospital record, recite that at 12:30 the patient "complained of severe pain in lower back and thighs—RX given." From this evidence, appellant in his brief states that claimant had been injected with 100 Miligrams of Demerol one half hour before his statement was taken, his testimony being that DeYong arrived at one o'clock p. m. with the Court reporter and began his interrogation immediately thereafter.

William Friedlin, Director of Nurses at the hospital, testified that the primary purpose of Demerol is to relieve pain, and that it will produce drowsiness.

Claimant testified that one of the men who called upon him to take his statement said they represented Employer's Mutual Insurance Company; that he gave them some kind of a statement but that he was in such extreme pain and also under the effects of "that shot" that "I couldn't know what I said." He then testified that he was asked questions with regard to the injury sustained while at work. Later he gave the following testimony: "Q. Give us the best of your recollection what your discussion was with him on that day? A. Actually, all I remember is him asking me some questions and that's about all. Q. What did the questions deal with? A. That I don't know altogether. Q. Do you remember what any of the questions dealt with? A. No. * * * You see at that time I was in such terrific pain that I couldn't think very straight * * * everything was kind of confused a little bit."

DeYong testified that before taking the statement he told claimant his name; that he represented Stupp Brothers in Compensation matters and wanted to ask him about the occurrence that had been reported to them. He said he arrived about 2:30 or 3:00 in the afternoon; that claimant was in bed at the time; that claimant did not at any time during the interview make any complaint of being in pain or complain about his physical condition during the time he was there; that there was nothing unusual in claimant's appearance; that Mr. Deffendoll's condition appeared at the time normal, that is, as normal as you could expect to find a patient in a hospital bed; that he was not overactive but did not give any indication of being tired or not desiring to talk; and that claimant responded to the questions asked in an alert and normal manner; and in fact volunteered considerable information. The witness further testified that claimant did not give the appearance of being under sedation.

Claimant admitted he had served five years in the penitentiary upon a conviction for armed robbery and had received a dishonorable discharge from the U. S. Army on June 23, 1954. He received psychiatric care in three different hospitals in 1965, and electroshock therapy at St. Mary's Hospital the same year.

■ After considering the foregoing evidence concerning the circumstances under which the statement was taken, we are of the opinion there is no merit to the point urged. A statement containing admissions against interest, such as the one in question, is admissible unless it is shown that it was taken when the person giving it was under such a mental state that he was unable to narrate facts and events in a way to be relied on; and whether it should be excluded on that ground is a matter of discretion. Claimant testified that at the time he was questioned he was in such great pain and so far under the influence of drugs that he was confused and could not think straight; that he could not know what he said. On the other hand, DeYong testified that claimant made no complaint of being in pain and did not appear to be under medication. He further stated that claimant responded to the questions asked in an

alert and normal manner. It further appears that in response to Mr. DeYong's questions, claimant gave a great deal of information about his personal history and background which claimant does not question. It thus appears there was an issue of credibility which the referee resolved in respondent's favor by admitting the statement in evidence, and while his ruling is not binding on review it is entitled great weight where it is urged that the evidence should not be considered.

Appellant's second point is that the statement was not admissible and should not be considered on review because the respondents failed to comply with the Section 287.215, RSMo. 1959, V.A.M.S. Said section provides that no statement given by an injured employee shall be admissible in evidence in any action for recovery of benefits under the Workmen's Compensation Law unless a copy thereof is furnished the employee or his attorney within seven days after written request for same.

In support of this assignment, claimant identified a letter dated December 24, 1964, addressed to Stupp Brothers Bridge & Iron Company. Said letter reads as follows:

"Dec. 24, 1964

Stupp Bros. Bridge & Iron Co.
3800 Weber Rd.
Lemay, Missouri

Dear Sir

Please send me a copy of the statement I gave to your insurance company man about how I was hurt on the job in April, 1964. He took the statement about April 27, 1964.

Thanks

Leslie Deffendoll
205 W. Loretta
St. Louis 25, Missouri"

---

Claimant testified he did not mail this letter but delivered it personally. He stated he received an answer by regular mail nine days later on January 2, 1965. On cross-examination, he testified that he delivered his letter to a receptionist at a desk at about ten o'clock a. m.; that he gave the copy of the statement he received in response to his letter to his attorney, Douglas O'Neill, but did not have the envelope in which the statement came. He identified a copy of the letter he received with the copy of the statement. This letter was dated December 29, 1964. It was addressed to claimant and recited: "In compliance with your request of December 24, 1964, we are enclosing copy of your statement."

Albert Cunliff, attorney for respondents, testified he received the letter from claimant dated December 24, 1964. He stated that "we received Mr. Deffendoll's letter by mail and we sent the reply by mail." He further testified he did not know the date claimant's letter was received, but that he replied to it December 29, 1964. He stated he had had offices in the downtown area since 1930, and it was his experience over the years that letters mailed in the downtown area before the six o'clock p. m. delivery will be delivered in the city and county area the next morning; and letters addressed to his office posted in St. Louis up until six p. m. will be delivered at his office in the early morning delivery. He further testified that the letter to claimant enclosing a copy of his statement was typed December 29, 1964, and that he personally took it to the mail chute and deposited it during the early part of the afternoon of that day; that in the normal

course of events it would have been received by claimant on December 30.

■ Here again is presented an issue of credibility. It has been held time and again that the Commission does not have to accept the testimony of a claimant as true. This is especially true if there is a substantial basis from all the evidence for a finding that such testimony is untrue. Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W.2d 136; Banks v. City of Hannibal, Mo.App., 283 S.W.2d 909, l. c. 913; Miranda v. American Refrigerator Transit Co., Mo. App., 392 S.W.2d 413.

■ Although claimant in the case at bar, testified he delivered his letter dated December 24, 1964, in person on that date, there was substantial basis in the evidence for disbelieving this testimony. Mr. Cunliff testified that the letter was received through the mail. Furthermore, it is unlikely that claimant would undertake to personally deliver the letter since there was no such urgency that would require such haste and the mails were readily available. The case was not at that time set for hearing. It was tried before the Referee on June 17 and 18, 1965. We do not believe claimant's testimony, but are convinced he did send the letter through the mail as testified to by Mr. Cunliff. We also believe that since judicial notice will be taken of the usual course of business of the mails, 31 C.J.S. Evidence § 52, p. 1049, said letter could not have been received by the addressee before December 26, 1964, the day after Christmas. It is common knowledge that mail is not delivered on Christmas Day. There was therefore compliance with the seven day rule since claimant testified he received the statement on January 2, 1965, seven days after receipt of claimant's demand.

It further appears from the evidence that on June 16, 1964, Max M. Librach, a member of the bar, wrote a letter to Mr. A. E. Cunliff requesting a copy of the statement in question. On June 17, Mr. Cunliff replied and attached to his reply was a copy of the statement. Mr. Librach, as heretofore stated, had prepared and filed claimant's original claim on June 9, 1964, in which he and Mr. Fox were listed as claimant's attorneys. Mr. Librach testified that Mr. Milton Fox was claimant's original attorney and that Mr. Fox took him in as co-counsel to handle Mr. Deffendoll's claim. On cross-examination, he testified that he had no retainer contract with claimant, but that claimant came to his office and that he advised him on several matters. He stated that on July 21, 1964, both he and Mr. Fox withdrew as attorneys for claimant. This was accomplished by a letter to the Commission of that date.

Claimant's version of his relationship with Mr. Librach appears in his cross-examination and is as follows:

"Q. How long was Mr. Librach your attorney? A. Approximately thirty days. Q. * * * When did you discharge Mr. Librach? A. About thirty days after I had him. * * * I know he was in with Mr. Fox, but I don't know how long Mr. Fox had brought him into the case or discharged him. Q. Well, there is a claim in the file of the Commission here in which we have a copy dated June 9, 1964, filed on your behalf by Mr. Milton R. Fox and Mr. Max M. Librach? A. Yes, sir. Q. Were they your attorneys as of June 9, 1964? A. I guess Mr. Librach was. I don't know. * * * All I know is he filed the petition. Q. Filed the claim? A. Filed the claim, yes, sir. Q. And, then, how long after he filed the claim did you discharge Mr. Librach? A. It was sometime in June that I discharged him. Q. Now, I show you a sheet of paper that has been marked Employers and Insurer's Exhibit 3 on the stationary of Max M. Librach, dated June 16, 1964, and ask you if Mr. Max M. Librach—was Max M. Librach your attorney at or about that time? A. Yes, sir."

Sometime thereafter, claimant was recalled to the witness stand by his present counsel to testify further with respect to his representation by Mr. Librach. He stated he never retained Mr. Librach as his attorney; that Mr. Fox retained Mr. Librach which fact he did not know until after the first claim was filed; that he hired Mr. Fox to work on his case because he wanted Mr. Fox to work on it and not somebody else, and that was one of the reasons he discharged Mr. Fox; that he had never seen Mr. Librach but once and that was when Mr. Librach brought insurance papers from the Aetna Insurance Company to him on May 5, 1964 when he got out of the hospital; that he was in Mr. Librach's office one time for about two minutes when Mr. Fox took him there to introduce him to Mr. Librach; that Mr. Librach did not say he was handling the case for Mr. Fox; and that about two weeks after May 5, 1964, he learned that Mr. Librach was associated with Mr. Fox in the case.

From the above testimony, it seems clear that Mr. Librach was one of claimant's attorneys when he requested a copy of the statement on June 16, 1964. Claimant so testified on cross-examination. His subsequent testimony is far from convincing and did not destroy his previous positive testimony. We therefore hold that there is no merit to appellant's contention that respondents failed to comply with the so-called seven day rule. His attorney received a copy of the statement on June 17, 1964, and claimant himself received a copy of same on January 2, 1965, seven days after respondents received claimant's demand contained in his letter dated December 24, 1964. No error was committed in admitting it in evidence, and it was evidence to be considered on review. There was therefore substantial evidence from which the Commission could reasonably find that claimant did not sustain an accident, nor was the decision contrary to the overwhelming weight of the evidence. The finding is not only supported by the admissions contained in the statement, but by the fact that claimant when giving a history of the incident at the hospital made no mention of any slip or fall preceding his alleged injury.

The judgment of the Circuit Court is affirmed.

RUDDY, J., concurs.

WOLFE, J., not participating.